Schleider vs. Dielman et al.

No. 10,857.

E. G. SCHLEIDER VS. P. W. DIELMAN ET AL.

1. An *option* is not an existing and complete agreement which contains a condition, but it is the supplement of an agreement, to the performance of which the assent of another is of the essence.

2. It is a mere pollicitation, not yet ripened into a perfect commutative contract. It belongs to that class of conditional covenants which obliges the party in whose favor such a stipulation is made to give notice to the one granting it of his intention to exercise it, before it becomes obligatory on the other.

3. A private corporation is a person in law quite as responsible for its contracts as natural persons are.
Notwithstanding such corporations possess the inherent power of dissolution at will, that right does not carry with it the authority of impairing the obligation of their contracts; but the liquidation, whilst it deprives the creditor of the power to compel specific performance, leaves his equitable remedy for the recovery of damages unimpaired.

4. As a general rule the *future profits* of a contract can not be included in the injury suffered by its breach; mainly for the reason that they depend upon so many and various contingencies that it is impossible for a court or a jury to arrive at any definite determination of the actual loss by any trustworthy method. They are open to the objection of remoteness, as well as of uncertainty.

5. When the breach of a contract consists in preventing its performance without the fault of the other party, who is willing to perform it, the damages which the latter can recover will consist of (1) what he has already expended toward performance, and (2) the profits which he would have realized by performance. Profits can not always be recovered. They may be too remote and speculative in their character, and, therefore, incapable of that clear and definite proof which the law requires. When not fully proven, or they are too remote, the true measure is the loss of outlay and expense.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

Schleider vs. Dielman et al.

*White, Parlange & Saunders* and *E. H. McCaleb* for Plaintiff and Appellee, cited: 20 An. 327; 2 La. 161; 10 N. Y. 489; 15 Pick. 351; Marcadé, Vol. VI, p. 176; 15 How. 304.

*Thos. J. Semmes* and *Buck, Dinkelspiel & Hart* for Defendants and Appellants:

1. The price of a sale must be *fixed by the parties*. There is no sale where the fixing of the price is left to one of the parties; or where it is left to a third person, who either will not, or can not, fix the price. C. C. 2034, 1764, 2439, 2464, 2465; Troplong, vente No. 151, 156, 157; Laurent, Vol. 24, Nos. 73-6; Marcadé, Vol. 6, p. 179; Aubry & Rau, 4 Vol., p. 338, No. 349; Mourlon, Vol. 3, No. 490; Duranton, Vol. 16, Nos. 105-117; Pothier, vente No. 29; C. Accarias, Précis de Droit Romain, Vol. 2, p. 453, No. 604; Fort vs. Union Bank, 11 An. 708; 14 Ves., Jr., 405; 4 Drewry, 140; 26 Beavan, 426; 4 Pick. 189; 2 Sumner, 539.

2. The sale to the association of business and good will transferred to it the right to use the name of the Louisiana Company. 10 Ch., Div. 437; 43 Ch., Div. 220; 14 Id. 598; 45 Id. 577; 113 Mass. 175; 36 Fed. R. 724.

3. Plaintiff sitting as proxy at a board of directors is as much bound as if he were not clothed with such proxy, but sat on his own account. 35 An. 744; 2 An. 211.

4. A party to a contract must endeavor to minimize his loss; failure of this duty will diminish his claim for damages to the extent to which he could have avoided the loss. 6 Wall. 99; 115 U. S. 229.

5. If a party assigns at the time a reason for his conduct, he can not afterward change his mind and assign a different reason. Railway Co. vs. McCarty, 96 U. S. 267.

6. Damages for loss of profits in a sub-sale can not be recovered unless the existence of the contract for resale was at the time of making the original contract communicated to the vendor. Thol vs. Henderson, 8 Q. B., Div. 458.

The opinion of the court was delivered by

WATKINS, J. This is an action for the recovery of purely prospective damages, alleged to have resulted from the loss of anticipated profits occasioned by the defendants' non-fulfilment of its contract, whereby its full term was abbreviated by the period of six years and more.

Judgment is claimed against defendants, as liquidators of the Louisiana Brewing Company, for the sum of $97,209.18, on that score, alleging its dissolution and liquidation, and claiming the right to have that sum paid from the assets in their hands.

The plaintiff prayed for and obtained an injunction, restraining the defendants, and the New Orleans Brewing Association—a new corporation into which the Louisiana Brewing Company and other

brewing companies had been consolidated—from disposing of said assets, and from surrendering them to the stockholders of the dissolved corporation, especially the stock and bonds which said liquidators had received from the Louisiana Brewing Association.

Stated in more precise terms, the claim of plaintiff is, that he had a contract with the Louisiana Brewing Company, whereby the latter agreed to furnish him with all the beer he required for bottling purposes, and to furnish bottling beer to no one else, for and during a term of five years, consenting that he should have the option to continue the contract in force for an additional period of five years. That, prior to the expiration of the term of five years, the corporation was, by a vote of its stockholders, voluntarily dissolved and its affairs placed in the hands of the defendants as liquidators, leaving said contract in force.

There is no fraud, tort or wrong charged in the act of dissolution, or any attempt to thereby avoid or evade the force and effect of their engagement; but the plaintiff's averment is that the obligation of the contract remained unbroken, notwithstanding the dissolution of the corporation.

The judge *a quo* perpetuated plaintiff's injunction and gave him judgment for the sum of $43,482.38, allowing as the value of the bottling plant $10,378.16, and as the amount of *future profits* $33,-104.22.

It is from that judgment that the defendants have appealed.

Originally, the Louisiana Brewing Company was engaged in the manufacture and sale of beer in the city of New Orleans, and in connection therewith it operated a bottling department for bottling beer, likewise for sale, the two plants being conducted co-operatively.

As bottled beer was principally marketed in localities distantly removed from the place of its manufacture, its introduction into new business communities necessitated the employment of traveling salesmen, and at heavy outlay and expense, to maintain its established trade relations. On this account, mainly, the brewing company disposed of its bottling plant and leased the buildings wherein it was located and was in full operation as "a going concern."

By this means the beer manufactory and the bottling department became separated, and each one passed under a separate administration.

Contemporaneously with the sale of the bottling plant to Daniels & Schleider—the predecessors of the plaintiff, whose rights he acquired—on the 1st of July, 1886, the contract sought to be enforced was executed.

The principal stipulations of their agreement may be thus summarized, viz. :

1. The Louisiana Brewing Company contracted to sell Daniels & Schleider the beer of its manufacture, and to no other persons or bottling establishment for bottling purposes, and to continue to thus furnish them beer for a period of five years.

2. Daniels & Schleider agreed to purchase all the beer they required from said brewing company, and to take and use no other beer than that of its manufacture, and to continue their purchases for a period of five years.

The present controversy involves an interpretation of the contract of the brewing company to sell plaintiff beer, and the solitary issue tendered is the *quantum* of damages plaintiff is entitled to recover upon the score of his loss of the anticipated profits of his bottling establishment, because of the brewing company's failure to carry its contract to its ultimate completion.

At date suit was instituted, there remained a little more than one year of the first period of five years unexpired; and there was, likewise, more than one year to elapse between date of suit and *commencement* of the further period of five years during which plaintiff had the *option* to keep the contract in force.

This action is for the recovery of damages *ex contractu*, resulting from the brewing company's simple inexecution of its contract to supply the plaintiff with bottling beer, which was occasioned by the purely lawful act of liquidating the corporation.

The plaintiff's counsel treat the contract as though the two five-year periods were instalments thereof, employing this expression, viz. :

" His existing contract had more than one year to run, and he had the privilege of renewing for a period of five years more. This privilege was an integral part of his contract and the company was as much bound by it, and bound to respect it, as it was bound by any other provision in the contract." Brief, p. 18.

On this theory counsel have formulated their demands, and the judge *a quo* accepted that theory and acted upon it in rendering

judgment, taking as the initial point of his computation the sum of $5517.37, as the annual net profits of the bottling business, and multiplying that sum by six, thus giving to plaintiff an allowance of $33,104.22 on this score.

In our opinion the learned judge of the district court misapprehended the true import of the plaintiff's *option*, and, so doing, incorrectly held it to be an integral part of the *absolute* contract—his judgment resting upon the incorrect hypothesis that the plaintiff had " exercised his privilege," and continued the contract in force for an additional period of five years, whereas he had not, in point of fact, so elected to continue the contract in force, by giving due notice to the brewing company before its liquidation.

An option is not an *actual*, existing contract, but merely a right reserved in a subsisting agreement, to the obligee, to continue it in force for an additional term; but its preservation depends upon the obligee's exercise of the faculty of renewal, and seasonable notice given to the obligor of his intention to exercise the same.    Massy vs. Mead, 2 La. 157; Lieutrand vs. Jeuneaud, 20 An. 327.

In a certain sense an option is a mere pollicitation, a promise without mutuality, not yet ripened into a perfect agreement containing mutual stipulations, which either may enforce, and from which neither is at liberty to recede.    It is an open proposition by one party to a contract, which must be accepted in precise terms by the other, in order that it may be binding upon both parties.

Without attempting any collation of authorities on this question, we make a single extract from a standard text writer on the subject, as aptly expressing our views upon the subject, viz.:

" It may be," says the author in treating of the conditions on which a sale of goods depends, " the happening of some *event*, and then the question arises as to the duty of the obligee to give notice that the event has happened.

"As a general rule, a man who binds himself to do anything upon the happening of a particular event is bound to take notice, at his own peril, and to comply with his promise when the event happens. But there are cases in which, from the very nature of the transaction, the party bound on a contract of this sort is entitled to notice from the other, of the happening of the event on which the liability depends."

The author then furnishes this illustration, to-wit:

" But no notice is required where the particular person whose action is made a condition of the bargain is named, * * * and no option to be exercised by the vendor. And it seems that this is the true test, viz., that if the obligee has reserved any option to himself by which he can control the event on which the duty of the obligor depends, then he must give notice of his own act before he can call upon the obligor to comply with his engagement."

Benjamin on Sales, pp. 561, 562, Sec. 577; see also Watson vs. Walker, 23 N. H. 471; De Mill vs. Hartford Insurance Company, 4 Allen, 341; Lent vs. Paddleford, 10 Mass. 230; Tasker vs. Bartlett, 5 Cush. 359.

In Huir & Loomis Ice Company vs. Heinze, 14 Southwestern Reporter, 756, the Missouri court said: " The option given by the company was never exercised, hence that clause of the proposition never became applicable."

Accepting this interpretation of an *option* in a contract, and applying thereto the evidence supplied by the record, and we have no hesitancy in reaching the conclusion that plaintiff never exercised his right, or gave any notice of his intention to exercise it.

While it is true that the plaintiff, in all of his relations of contractor with the brewing company, occupied the position of a third person, yet the fact is quite undeniable that he was both a director and stockholder of the corporation at the same time; and, that whilst negotiations were in progress, looking to a liquidation, the plaintiff actively participated therein, and gave them countenance and support; and they resulted in its virtual assignment to the New Orleans Brewing Association.

These negotiations occasioned several meetings of the stockholders, many of which were attended by the plaintiff; though it is contended by counsel that he did not participate therein, and they state in their brief, to-wit:

" Schleider favored all the negotiations to sell to the English syndicate, but when the question of consolidation came up, although he was one of the largest stockholders in the Louisiana Brewing Company and attended the meeting at which the proposition to dissolve was voted upon, he *refrained from voting*, because he was apprehensive that the dissolution might affect his contract rights." He was present " at the meeting at which the dissolution was determined upon, * * and did not vote. * * Some one remarked that

the voting was about to close, and asked Schleider if he did not wish to vote.    There is some discrepancy in the evidence, as to the reply that Schleider made.    Schleider says  positively that in declining to vote for the liquidation,  he gave as his  reason that by doing so  he might imperil his rights as a contractor.''    Brief, p. 7.

As a witness plaintiff states that he had been advised  by  counsel not to vote in the stockholders' meeting; and that he was present at that  meeting and publicly stated the reasons why he  could  not consent to vote for the liquidation nor  sign  any  document to  that effect.

It is in proof that the plaintiff made similar statements just before and just after the meeting to several of the stockholders.

But  considering all the evidence on this question, and it is quite apparent that plaintiff acted and voted in such manner as to  *tacitly permit,* so far as he was concerned,  the  liquidation  to  take  place, and thus realize a share of the large profits of the  adventure,  and at the same time to protect his contract rights from impairment.

This is evident from his general  course of  conduct, after having taken the advice of a lawyer  as to the  nature  and  extent  of  his rights, and the best method of protecting them.

Openly and publicly plaintiff made no protest.   He assigned to his associate stockholders no ground for his refusal to act.   But just as soon as the dissolution of the corporation  became  an  accomplished fact, he promptly instituted  this  suit  against  the  liquidators appointed to adjust its  affairs,  and,  by  injunction,  arrested in their hands, the *entire* avails of its liquidation, and from  which  he claims the right to receive a little less than *one hundred thousand dollars,* as damages resulting to his bottling business, because of the dissolution —in the meanwhile making no disavowal of his  intention to  accept his share of the *immense* profits realized by the liquidation.

Without commenting on plaintiff's course of dealing with his associates, or making any application of them  to  the *actual* contract, in respect to its unexpired term, we may, with becoming propriety, state, and emphasize the statement,  that there is not  one  scintilla of testimony which even *tends* to show that he ever asserted any intention to *exercise his* option; nor that he did any *act,* or uttered any *word,* that would, by any fair and reasonable interpretation, *indicate* such purpose on his part.   And we  are  well satisfied  that if he entertained such an idea it was only a thought he harbored in his own

mind, but never communicated to the stockholders or directors of the corporation, and who, in the absence of any such notification, had a perfect right to assume that he had abandoned it, and act accordingly.

Inasmuch as the *exercise* of the option was exclusively under the plaintiff's control, and as he was not only aware of the proposed liquidation but was present and participated in all the proceedings that led up to the liquidation, though he declined to sign the *final act*—a clear and indisputable obligation was imposed on him, to have given notice to the stockholders' meeting of his *intention to exercise his option*, and failing to do so he must be conclusively presumed to have abandoned such right.

This being our conclusion the option of the plaintiff to continue the contract in force for a new and additional term is eliminated from the controversy.

In respect to the immediate effects of the liquidation of the corporation on the plaintiff's contract rights, there can be but little difficulty, as it can not be doubted that the liquidation of a corporation has the immediate effect of terminating all of its purely *personal* obligations and of relegating the beneficiaries thereunder to an action in damages in keeping with its covenants.

A corporation is quite as much bound as a natural person to the performance of its contracts.

The law, in authorizing the creation of corporations, provides, at the same time, for their forced as well as for their voluntary dissolution.

The law authorizes the stockholders of a business corporation, such as the Louisiana Brewing Company was, to dissolve at will, upon a vote of three-fourths of its stockholders. Rev. Stats., Sec. 687. This privilege is incorporated in the company's charter, and no act of the board of directors could deprive the stockholders of such rights; and the contract the corporation had made with the plaintiff could have no such effect.

It has been repeatedly decided that "the laws of a State in this regard enter directly into the contract, and, as corporations have the power to dissolve themselves, or consent to a forfeiture of corporate franchise, all persons must be regarded as having contracted upon the hypothesis of the existence and possible exercise of this power." State vs. New Orleans Gas Light Company, 2 R. 332;

Hunter vs. Insurance Company, 3 An. 294; Palfrey vs. Paulding, 7 An. 363; Trisconi vs. Winship, 43 An. 49; Mumm vs. Potomac Company, 8 Peters, 152; Railroad Company vs. State, 29 Ala. 586; Tuft vs. Pittsford, 28 Vermont, 286: Given's *Ultra Vires*, Secs. 138, 435.

But it is equally true that such dissolution does not destroy the obligation of the company's contracts—the equitable rights of creditors surviving the act of dissolution, and attaching to the assets and property of the corporation in the hands of its liquidators. Morawitz on Corporations, Sec. 1035; Curran vs. Arkansas, 15 How. 304.

Whether, however, obligations *in futuro* of a corporation, such as plaintiff seeks to enforce, survive a dissolution, is a question of serious difficulty.

The right of dissolution being expressly granted by law, and the law being read into such a contract, it is not easily perceived how it could be enforced specifically, or damages for non-performance granted—non-performance being the *necessary* result of dissolution.

*Lex neminem cogit ad impossibilia.*

But, preliminary to this discussion, a question arises in reference to the plea of estoppel that is urged against the plaintiff, based on the ground that he was a stockholder and director in the corporation, and participated in the proceedings which culminated in its dissolution, and is, by such action, concluded from claiming damages resulting from such dissolution.

*Quoad* this transaction, plaintiff was an utter stranger to the corporation, and has a right to be dealt with as such, and to have his contract interpreted just as though he had no relations of trust with the corporation, for the principal and sufficient reason that his action was not controlling, and any resistance on his part, to dissolution, could not have prevented it; and equity does not require resort to a vain effort to accomplish an impossibility.

We are, therefore, of opinion that the estoppel urged is not good.

Whatever may be the correct view to be taken of the allowance and measure of damages, it is obvious that the rights of all parties became fixed and irrevocable at date of dissolution, and that which in the contract was potestative or conditional became absolute at time of liquidation.

In a recent and well-considered case the Florida court said:

"It has been held in England, as well as in this country, that

when one party, before the time of performance of the contract has arrived, renounces it to the other party, the latter may act upon the renunciation, treat the contract as broken, and sue before the time for performance." Sullivan vs. McMillan, 8 So. Rep. 450.

The purport of that opinion is that when there is an *executory* contract for the manufacture and supply of goods from time to time, to be paid for after delivery, if the purchaser, having accepted and paid for a portion of the goods contracted for, gives notice to the vendors not to manufacture any more, the vendor being able and desirous to complete the contract he may, without manufacturing and tendering the rest of the goods, maintain an action against the purchaser for a breach of contract.

To the same effect are numerous other authorities, to-wit: Howard vs. Daly, 61 N. Y. 362; Dugan vs. Anderson, 36 Md. 567; Fish vs. Folley, 6 Hill. 54; Tinny vs. Ashley, 15 Pick. 574; Muttaly vs Austin, 97 Mass. 30; Smith vs. Lewis, 24 Conn. 624; Falls vs. Hemmingway, 64 Me. 373; Morrison vs. Loryoz, 9 Minn. 319; Town vs. Turnpike Co., 14 Vt. 311; Railroad Co. vs. Van Duson, 29 Mich. 431; George vs. Railroad Co., 8 Ala. 234; Friedlander vs. Pugh, 43 Miss. 111; Railroad Co. vs. Howard, 13 How. 307.

Considering plaintiff's claim for damages we find it to be predicated on the principles of the code, and he makes claim to reimbursement exclusively upon the ground that the inexecution of the company's agreement to continue to supply him with beer of its manufacture for bottling purposes rendered his bottling plant absolutely useless to him, and caused the destruction of his business, and, hence, the measure of his damages is the loss of the profits anticipated to result from that enterprise, for the residue of the unexpired term.

The controlling article of the code on the subject " of damages resulting from the unexecution of obligations," declares that " the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived;" or in the further words of the article, " when the debtor has been guilty of no fraud, or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract." R. C. C. 1934.

In this connection the question to be determined is, whether the unearned profits of a transaction properly enter into a calcula-

tion of the loss which the creditor has sustained, and the profit of which he has been deprived, in the sense of that article.

The decisions based on that article have invariably placed a strict interpretation on its provisions, the court, generally, awarding only such damages as will fully indemnify the creditor, and, disallowing speculative profits, confining them to the immediate and direct consequences of the breach of contract.

Such is the purport of the following cases, viz.: Ryder vs. Thayer, 3 An. 150; Arrowsmith vs. Gordon, 3 An. 105; Porter vs. Barrow, 3 An. 140; Reading, Price & Co. vs. Donovan, 6 An. 491; Smith vs. Thirlew, 17 An. 239; Birge vs. Railroad Company, 37 An. 468; Vidalat & Co. vs. City of New Orleans, 43 An. 1121.

In Harrison vs. Railroad Company, 28 An. 777, quite a similar question arose to the one under consideration, and the court said: "The question is, what damages had the plaintiff sustained *up to the time this suit was instituted*, and how are those damages to be ascertained."

An examination has satisfied us that our jurisprudence is in accord with the opinions of text writers and the jurisprudence of other courts of the country in this regard.

One author announces the general rule to be that an allowance of damages should be restricted to "the natural and proximate consequences of the breach." Southerland on Damages, pp. 17, 74.

Another says: "The *future profits* of a business, which has been interrupted, are open to the objection of remoteness as well as of uncertainty." 3 Parsons on Contracts, p. 281.

Another says: "It is a rule that a catching bargain shall not be taken advantage of, so as to enable the plaintiff to put into his pocket a greater sum of money than form a fair and reasonable compensation for the injury he has sustained by the breach of a contract." 2 Addison on Contracts, p. 1110.

The summary of opinion of the courts of the country, in respect to the allowance of *future profits* as an element of damages, seems to incline in its favor, with certain modifications, and they appear rather to turn upon the question of the *remote* and *speculative* character of the damages claimed than upon their allowance *vel non* on the score of being future profits.

In United States vs. Behan, 110 U. S. 328, the Supreme Court said: "When the breach of a contract consists in preventing its per-

formance without the fault of the other party who is willing to per-
form it, the damages which the latter can recover will consist, first,
of what he has already expended toward performance, and, second,
the profits which he would realize by performing the whole contract.

"The second item, profits, can not always be recovered. They
may be too remote and speculative in their character and, therefore,
incapable of that clear and direct proof which the law requires."
Stating in conclusion, that "the *prima facie* measure of damages for
the breach of a contract is the amount of the loss which the in-
jured party has sustained thereby."

This rule, in the assessment of damages *ex contractu*, has been fol-
lowed by the State courts, in varying forms of expression, and in
many cases. *Vide* Walworth vs. Wettskind, 26 Kan. 482; Cates vs.
Sparkman, 11 S. W. Rep. 846; Bingham vs. City, 13 Pac. Rep. 408;
Griffin vs. Colar, 10 N. Y. 489; Snell vs. Cottingham, 72 Ill. 161;
Ruff vs. Renaldo, 55 N. Y. 664; Hexter vs. Knox, 63 N. Y. 561;
Hinckley vs. Beckwith, 13 Wis. 34; Shepherd vs. Gaslight Co., 15
Wis. 849; 1 Sedg. Dam. 77; Field Dam. 10; King vs. Colter, 8 S.
E. Rep. 59; Hamilton vs. Schumaker, 15 S. W. Rep. 715; Railroad
Co. vs. Hutchins, 48 N.W. Rep. 398; McHose vs. Fulmar, 73 Pa. St.
365; Masterton vs. Hill, 7 Hill, 61.

Without entering into a more critical analysis of authority in ref-
erence to the allowance of damages for further profits, we think it
quite clear that the plaintiff has not stated a proper case for the al-
lowance of such profits. For it appears from the evidence that the
plaintiff was a large stockholder in the Louisiana Brewing Company,
and, also, a director, and, as such, he participated in all the proceed-
ings which led up to and resulted in the liquidation of that corpora-
tion. The evidence leaves no doubt that he favored and approved
it, and desired its consummation. The liquidation produced large
pecuniary advantage to the stockholders, to a participation in which
plaintiff is entitled.

It is true that he declined to vote for or to sign the final act of
liquidation, assigning as his reason that it might prejudice his con-
tract, yet, even at that time, and with the idea of protecting his
contract uppermost in his mind, he failed to oppose or vote against
it, but, on the contrary, signified his approval of the action that was
taken by his associates.

It is difficult to appreciate how his mere refraining from voting

on the question of dissolution alters or improves his position in any respect.

The only importance attaching to the question of dissolution *vel non* arises from the fact that it placed the corporation in the impossibility of performing its personal obligation under its contract with plaintiff. But the final result was just as effectually brought about by the various measures to which he expressly gave his assent and approval, and which operated the sale of the plant of the corporation and the abandonment of the enterprise.

If evidence was needed to further substantiate plaintiff's full knowledge of and acquiescence in the liquidation of the corporation, it is readily supplied by the letter his lawyer addressed to the New Orleans Brewing Association soon afterward, in which the desire is expressed " that some arrangement be made with him, by (the) association, at an early day," etc. Replying thereto the brewing association promised and agreed to carry out the contract of the Louisiana Brewing Company in all respects, but the only answer he made to this proposition was the institution of this suit.

The resolution of the brewing association tendered exact and specific performance of every obligation of the contract.

Plaintiff, it is true, suggests certain *possible* disadvantages to which he would be subjected by the change of proprietorship, but they are more seeming than real.

It is true that in effecting the consolidation of the breweries, the brewing association acquired the ownership of other bottling establishments attached to other breweries; *but these existed prior to the liquidation* of the Louisiana Brewing Company, and were in active operation and competition with the plaintiff.

The evidence further shows that there were on hand at date of liquidation over 5000 barrels of the Louisiana beer, which had been actually brewed by that company, and which were subject to plaintiff's order, and were tendered to him by the brewing association; and which would have supplied him under his contract, for more than one year; and he refused to accept it.

On the contrary, plaintiff chose to abandon his business and bring this suit for damages.

Under the facts and circumstances related, we are of opinion that the plaintiff's case must fail, under the maxim *volenti non fit injuria*.

With regard to that part of the judgment awarding the plaintiff

$10,378.16 as the value of his bottling plant, our conclusion is that it is likewise erroneous, and must be reversed; because the terms of the act of sale of the bottling plant to Daniels and Schleider are that, in case of the discontinuance of the bottling business, the Louisiana Brewing Company was reserved the right to purchase the plant, at a price to be fixed by arbitrators. The liquidators invoke that stipulation, and they have an absolute contract right to have it enforced.

It is therefore ordered and decreed that the judgment appealed from be reversed, and that there be judgment rejecting the plaintiff's demands at his cost in both courts—the rights of all parties being fully reserved in reference to the bottling plant under the contract.