PROVOSTY, J.
In 1911 the two defendants, I. Duncan Norwood and T. H. Rogers, under the trade-name of Norwood Pepper & Manufacturing Company, established a factory at Norwood, La., for drying peppers and manufacturing peppers into extracts and sauces. They did this on a- borrowed capital of $1,200. They bought the peppers from the farmers of the neighborhood, including Norwood. Rogers managed the business. For his service's he was paid a small salary; his real remuneration being, as we understand, in the prospect of the expected growth of the business. In 1911 they made no profit. In 1912 they made enough to pay up the interest on the borrowed capital, and to purchase and install another machine. In 1913 they increased their business, and paid the interest on the borrowed capital and part of the prihcipal, and installed another machine and a dryer. In 1914 they again increased their business, and paid up the balance of the borrowed capital. In 1915 they added to their plant a dryer and a blower at a cost of $1,000, and with $1,200 of borrowed capital enlarged their building. On the 11th of November, 1914, they “appointed” the plaintiff their selling agent. He was an expert commercial broker and sales agent of 30 years experience, thoroughly acquainted with the spice trade, and knowing, therefore,
*381 how, where, and to whom to dispose' of the output of the factory to the best advantage. He was not to deyote his entire time to the business of defendants, but was to “visit once a year the principal spice manufacturing centers of the United States where he had reason to believe the” products of the factory of the defendants could be sold. Defendants “agreed to pay him” a commission of 5 per cent, on the gross sales, and to “divide equally” with him whatever amount the goods were sold at by him “over and above the price given” him by the defendants. The contract was in writing, signed by the two defendants, and was for two years, with privilege on his part of renewing it for five years more. The crop, or manufacturing, season began in the latter part of July and ended during the winter. The prices “given” him, as provided in the contract should be done, were the same at which the defendants had been theretofore selling their products, with this difference, however: that the former prices had been f. o. b. New Orleans, whereas those “given” were f. o. b. Norwood; so that the latter were higher than the former by the amount of the freight from Nor-wood to New Orleans. This price allowed the defendants a profit of some three or four cents on the dried peppers, to which line the product of the factory was confined before the termination of the agency and the occurrence of the event which has given rise to this suit. For undertaking the agency of defendants, plaintiff gave up an agency which for the time being was more remunerative than that of defendants, but with no prospect of increase; whereas, that of defendants offered, as plaintiff thought, a bright prospect in that direction. This was so because the peppers produced by the lands tributary to the factory of defendants were of a peculiar, superior kind, such as, by their brilliancy of color, might compare with the high class and high-priced imported Hungarian pepper, and yet be sold much cheaper, at a handsome profit, so that they might undersell the imported peppers, and not be subject to competition by the ordinary commercial pepper. No writing was at first executed for completing the contract by “giving” to plaintiff the minimum prices at which the goods were to be sold, but on June 8, 1915, a formal writing was drawn up for that purpose. The agency continued for IT months. In that time plaintiff realized from his commission of 5 per cent, and from the average of the sales prices over those “given” him, $2,100. Plaintiff was to pay his own expenses. They amounted to $100. So that in the 17 months of the duration of the agency plaintiff realized $2,000, or at the rate of $117.60 per month. Until the happening of the event which brought the agency to an end things went on harmoniously, and with apparently every prospect of brilliant success. Defendants do complain that during a tíip which plaintiff took to California, for pleasure, or other business than theirs, in the month of July, 1915, they were unable to locate him.' As a matter of fact some letters mailed to him, and said to have been prop-' erly addressed, were returned undelivered. But this nondelivery of the letters appears most unaccountable, under the circumstances, for plaintiff received a letter from defendants of date July 1st, mailed to his California address. Be that as it may, the business of defendants is not shown to have suffered in the least from this inability of theirs to communicate- with plaintiff; for plaintiff testifies, and is not contradicted, that the output of petitioner’s factory was sold by him practically in advance, and could have been readily sold if several times as large. In the early part of 1916 the defendants organized a corporation in conjunction with Messrs. O. B. Steele and Joseph Gebelin, first vice president and cashier, respectively, of the Bank of Baton Rouge, to carry on the same *383 kind of business at a factory to be located in that.city; and they transferred their said business and its assets to this corporation in payment of their shares of stock in it. Plaintiff protested against this action of defendants as soon as he heard of its being in contemplation; and, the protest not availing, he sought to have the corporation make a similar contract of agency with him, but ineffectually, and he then brought this suit in damages for breach of contract.
He claims that the business of defendants would have increased largely if it had been continued, and that the agency would have yielded him at least $4,000 per annum, and he fixes his damages in that amount.
Defendants deny that the contract was violated. They were under np obligation, they say, to continue the business for any specified time, and plaintiff was to be their agent only so long as the business continued.
[1] We do not so read the contract. It was for two years, with the privilege of renewal for five years more. Defendants obligated themselves for that length of time; and, since the agency could not go on without the business going on, the fixing .of that term for the agency fixed the term for the continuance of the business by necessary implication. Of course defendants were at liberty to discontinue the business at any time, and thereby put an end to the agency, but subject to the obligation pf compensating plaintiff for whatever injury or loss he might suffer thereby.
[2] Again, it is said in behalf of defendants that the reason for discontinuing the business was that it was losing money, and that the contract necessarily contemplated its being discontinued in that contingency.
The answer is that the business was not losing money. Its assets were taken over by the corporation at a cash valuation of $13,-000. Out of nothing it had grown in four years to that value, to say nothing of its having become an established business with a bright prospect — a fact which is found .reflected in the adoption by the corporation of the trade-name of the firm, with the addition only of the word Baton Rouge; thus, Baton Rouge-Norwood Pepper Manufacturing Com1pany. Against this1 $13,000 the two other incorporators contributed towards the capital of the corporation a factory building and site they owned in the city of Baton Rouge, at a valuation of $11,000, and $4,000 in cash. The capitalization was $30,000. Two thousand dollars of the capital stock was not issued.
It is not pretended that the cost of production had increased; how, then, could.the concern have been losing money, when in the 17 months of plaintiff’s agency the prices “given” to plaintiff for the sale of the products were higher than those at which defendants had been selling theretofore, and in addition thereto a very considerable amount of overage was realized? The bulk of the $2,100 which the agency yielded to plaintiff in the 17 months of his agency was derived from this Overage, and necessarily the defendants realized a like amount.
Whether the $13,000 valuation placed upon the assets was after all debts paid, or subject to a debt of $1,800, which the firm owed to Mr. Pemble, and subject to another debt due to the Bank of Baton Rouge, amount not stated, is not shown in the record.
Mr. Rogers testified that he and Mr. Nor-wood had discontinued the business “simply because we could not run it.” That the result, if they had kept on, would have been that they “would have failed entirely.” He says that the firm was indebted to a Mr. Pemble in the sum' of $1,800, and also to the Bank of Baton Rouge., He.does not say, however, whether the firm 'had or had not products on hand sufficient for meeting these debts. Elsewhere in his testimony, speaking of Messrs. Steele and Gebelin, he said: “We didn’t try to sell to them. They made the *385 proposition .to buy us out. They thought it was a good thing.” And Mr. Gebelin testified as follows:
“A. Tes, sir; I mean the canning plant in Baton Rouge. We sold the machinery out of the plant, and we had the building there on our hands, doing nothing. It is admirably located for a manufacturing plant, having a direct switch connection with the L. R. & N. Railway. I knew Mr. Rogers, and he was in the Bank of Baton Rouge quite often, and we spoke of the matter one day, and discussed the forming of a new company and moving the plant to Baton Rouge, Baton Rouge being a very fine distributing point — admirably located for a distributing point. I suggested that if we could go together it would be better, and that the profits would be better for all of us, as we could get all the money we wanted, and that we could branch out. I finally convinced him, and then we organized the Baton RougeNorwood Pepper Manufacturing Company, Inc. We believed ourselves that we could make something out of it, and we finally convinced Mr. Rogers that it would be a better thing for him. We then organized the new company.”
In tbis testimony is found, we think, the true explanation of why the firm merged into the corporation. The two business men of Baton Rouge thought the business was a good one, and by persuasion induced defendants to make the change.
Mr. Norwood testified as follows:
‘•Q. Now, in 1912, did you still continue in business? A. Tes, sir; we continued in business.
“Q. Did your business increase? A. We got a little more peppers raised that year than the year before.
“Q. Did you make any profit that year? A. Well, we made a little profit — enough to pay the interest on what we borrowed.
‘■Q. Is that all? A. Tes, sir; and bought another machine that we needed.
“Q. Now, in 1913, did! the business increase any? A. A little; yes, sir. Every year it increased a little. ,
“Q. What did you make in 1913? A. Why, we made a little more that year. We bought the machine and another dryer. We bought a smaller dryer from Centerville.
“Q. What were the profits of your business that year? A. Well, very little; we paid the interest on the money a.ad part of the principal that year. We have never paid all of that $1,-200 yet.
‘‘Q. That is all you made in 1913? A. Tes, sir.
“Q. Now, 1914, is the year you commenced having Mr. Chamberlain sell for you, was it not? A. Tes, sir; that was in 1915.
“Q. Well, what did you do in the year 1914? A. We bought a little more pepper that year and made a little more money, and cleaned up the $1,200 that we owed. We were three years cleaning that up.
“Q. That is all you did in those three years? A. That is all we done in three years. That is all.
“Q. It took you three years to pay $1,200 and the interest? A. Tes, sir; and the expenses, of course.
“Q. Well, of course, the expense of conducting the business. Now, when Mr. Chamberlain went in with you what did you make? A. We got a whole lot more pepper raised that year and we done a little better that year.
“Q. Isn’t it a fact that you did a good deal better that year? A. We done more business, yes; but we didn’t get anything out of it. Mr. Chamberlain got it all himself.
“Q. How much did it cost you to buy the product — to prepare it for the market? A. It cost us about 7% cents to get it ready for market.
‘■Q. Did that include the' cost of the peppers from the farmers? A. Tes, sir; and manufacturing it.
“Q. That was the cost of the raw material and manufacturing? A. Tes, sir.
“Q. So, then, if it was sold for 10% or 11 cents a pound the profit would be 3% or 4% cents a pound? A. Tes, sir; or dried pods about 3 cents a pound.
“Q. Well, the question of profit is a pure question of mathematics. If it cost you 7% cents a pound to put it on the market and if you get 11% cents for it, your profit would be 4 cents a pound? A. Tes, sir; if we get that.
“Q. Now, if Mr. Chamberlain got $2,100 in overage, didn’t you get that same amount? A. No, sir.
“Q. How is that? A. No, indeed, we did not.
“Q. Why didn’t you? A. Because he, got 5 per cent, commission and one-half of the gross sales. We paid him a commission on the whole thing — on the gross sales — and then he took out 5 per cent, on the overage.
“Q. Well, if you shared with him half, didn’t you make as much overage as he did? A. Tes, sir; as much overage, but not on the 5 per cent.
“Q. I am not thinking about the 5 per cent. *387 When he sold anywhere up to 10.5 cents or 11.5 cents he got 4 per cent.? A. Yes, sir.
“Q. Now, when he sold it for more than 11.5 cents, there was overage, wasn’t there? A. Yes, sir.
“Q. And Mr. Chamberlain’s half of that overage was $2,100? A. Yes, sir; that was his commission and all.
“Q. How much . of that was commission ? A. I never figured it out.
“Q. Isn’t it a fact the larger part of it was ovex-age? A. Yes, sir; the most of it was overage.
“Q. It is a fact that very much the greater part-was overage? A. Yes, sir.
“Q. Then, didn’t you get .as much overage as he did? A. Yes, sir; we divided equally.
“Q. Now, what did you buy in the way of machinery, the year he was selling for you? A. One drier and a blower-.
“Q. What did that cost you? A. They cost us $500 each.
“Q. $1,000 for the two? A. Yes, six-.
“Q. Then didn’t you build a factory in addition to that? A. Yes, sir.
“Q. How much did the factory cost you? A. It cost us about $1,200. We borrowed the money to build it with, though.”
The contract by its express terms was to continue for two years, with the privilege on the part ol' plaintiff of extending it for five years more. It was therefore not terminable at the will of the defendants.
That it should be continued for the two and five years was as much a part of the agreement and contract as that the. plaintiff should furnish his services and should receive a commission and other payment. No doubt if, from any cause beyond the control of the defendants, the business had had to be discontixiued, the agency would have automatically terminated with it; but no such cause is shown. On the contrary, Mr. Norwood says: “We could have run it by going along like we did before.” The fact that the corporation continued the business shows that the discontinuance by the firm was altogether voluntary. A labored effort is made by Mr. Rogers in his testimony to show that the funds with which to continue were lacking ; but he does not say that all the money needed might not have been procured by simply bon-owing. He also says that he and Norwood had derived no benefit from the business. In that statement he loses sight of the fact that, starting from nothing, the business had in four seasons grown to the proportions of an established concern with $13,000 of assets. Whether any debts would have had to be deducted from this valuation does not appear. That the firm was on the way to larger profits is shown by the desire of Messrs. Steele and Gebelin, both of them experienced business men, to form a company for taking over the business with a view to continuing it; and is further shown by the fact that in the 17 months of his agency, in what may be considered to have been the formative period of the business, plaintiff realized $2,100, the greater part of which represented his one-half of the overage, or difference between the price obtained by hixn and those “given” him.
Money was needed by the firm in any considerable amount only to pay for the raw material (the peppers) bought from the farmers, and oxily for the interval between the 'date of the purchase of the materials and that of the sale of the products, a matter of merely u month or so; for the' evidence shows that, through plaixxtiff’s agency, the products were sold practically in advance. That a going and prospering concern, such as that of defendants, could not have obtained the advance of these necessary funds to pay for the raw material on hand ready to be manufactured and sold, is not shown, and is not to be believed. Not oxily was the credit of the firm good, out that of Norwood, who was a commercial partner, and therefore responsible for any debts the firm might contract, was, as we gather from the record, good for very much more than the fix-m could possibly have needed.
While the record shows what part each of the pai-tners took in the conducting of the business, it does nor: show what were the terms of their partnership agreement. Per *389 liaps Norwood would have had the right, as between himself and his partner, to prevent the firm from involving his personal liability by contracting debts, even for the purchase of raw materials, but, as between him and plaintiff, we do not think he enjoyed that privilege. Eor the contract with plaintiff amounted practically to a representation on his part that the business would continue, for the term of the contract, as it had been going on in the past, and in the past he had freely allowed his liability to become thus involved, not beyond the ability of the firm safely to meet from its own resources, but up to the temporary needs of the firm within that limit.
Another reason for disbelieving that this alleged lack of funds was the cause of the discontinuance of the business is that plaintiff had agreed to procure for the firm all the funds it might need for operating, and that no call was made upon him in that direction.
[3] Another contention of defendants is that the contract was voluntarily abandoned by plaintiff. The facts in that connection are as follows: Plaintiff and defendants and the two Baton Rouge gentlemen met in that city by appointment to see whether a contract could be made by the projected corporation for taking the place of the one now sued on, and a conference was had with that object in view at the Bank of Baton Rouge. Before going to that conference plaintiff had met Mr. Norwood in the lobby of the hotel, and informed him that he had consulted counsel and would stand upon, his rights, unless a new contract was made to take the place of the one now sued on; and plaintiff had also caused this contract to be recast by his lawyer, so as to put it in better shape; and he carried this revised contract with him to the conference. At the conference, after Messrs. Steele and Gebelin had positively refused to enter into the contract, as being too advantageous to plaintiff, a. conflict of words, which came near culminating into one of blows, between Mr. Rogers and plaintiff was precipitated by a misconstruction placed by Rogers upon a statement made by plaintiff. At the beginning of his agency, plaintiff had had the handling of some pepper extract which the persons to whom he had offered it had found to be bad. Referring, or intending to refer, at the conference to this extract, plaintiff said that it was “rotten.” Rogers understood the statement to have been that all of defendants’ products were rotten, and took offense, and the altercation followed, which, as we understand, broke up the conference; the last words of plaintiff being that he did not want to be associated with men who did not want him, nor to do business with men who did not want him. It is upon this expression that defendants base themselves for contending that plaintiff abandoned, or renounced, the contract sued on. At the conference the contract sued on was not in question. The discontinuance of the business of the firm of Rogers & Norwood, and the transfer of it to the corporation, was a fait accompli, and had rendered the contract sued on fully and finally functus officio, save for whatever rights the plaintiff might have for the violation of it. The idea that plaintiff, by his said expression, did not have reference solely to the corporation which had refused to contract with him and to the business which would have had to be done if the corporation had contracted, which was the thing under consideration at the conference, but was renouncing his legal rights under the contract sued on, which rights he had obtained legal advice on in anticipation of the new contract not being entered into, is not, it seems to us, to be entertained a single moment.
[4] In the event the court should find that the contract was violated, defendants contend that only such damages can be recovered for breach of cpntract as were within the con *391 templation of the parties at the time of the contract, and that future profits dependent upon contingencies, such as the result of an enterprise itself dependent upon the employment of labor and the wants of a community, are too uncertain to serve as a basis for judgment. And the learned counsel of defendants cite in that connection the following cases: Dwyer Bros. v. Tulane Ed. Fund, 47 La. Ann. 1232, 17 South. 796; Bergen v. City, 35 La. Ann. 523; Gobet v. Municipality No. One, 11 La. Ann. 300; Schleider v. Dielman, 44 La. Ann. 462, 10 South. 934; City of New Orleans v. Kerr, 50 La. Ann. 419, 23 South. 384, 69 Am. St. Rep. 442; Harrison v. R. R. Co., 28 La. Ann. 777; U. S. v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168; Alleman Planting Co. v. Baker Co., 134 La. 690, 64 South. 677.
We do not understand the learned counsel of defendants to argue that the profits now claimed by plaintiff were not in the contemplation of the parties at the time of the contract. Had the compensation of the plaintiff for his services been fixed in a definite sum, instead of on a percentage basis, the total amount for the unexpired term of the contract would have been due and recoverable at the date of the violation of the contract; for although the language of the contract is that plaintiff was “appointed” agent, and not that he was hired, the contract was in reality a hiring of plaintiff’s services; and, when such a contract is violated, the entire amount to become due under it may be recovered at once. C. C. art. 2749. The compensation was expressly stipulated; hence it was within the contemplation of the parties. Indeed, it formed part and parcel of the contract in such way that the whole amount, whatever it might eventually prove to be, was stipulated in favor of plaintiff.
When a contract is thus made with a view to future profits, and is violated, the future profits necessarily are due. What their amount may be is another question; and, of course, judgment can be rendered only for such amount as the court can become satisfied, with reasonable certainty, would have been realized if the contract had been carried out. Reasonable certainty, not absolute certainty, is sufficient; for in such cases the attaining of absolute certainty is, in the nature of things, impossible, so-that to require it would simply amount to a confession on the part of the courts of inability to do justice in all such cases.
As an element of uncertainty in the situation, counsel suggest that the farmers of the neighborhood might have discontinued the raising of peppers; and, again, that the crops might have failed. This is very true; but the defendants discounted this risk, when they ventured into the enterprise, as being improbable; and the parties, when they made the contract sued on, do not seem to have considered such a thing probable; and, as a matter of fact, this case was tried in October, 1917, after the crop seasons of 1916 and 1917 had gone by, and we doubt not that, if the crops of these years had failed, proof would have been made of that fact. Nor is it shown that the pepper crop is a precarious one.
Again, it is. suggested that the defendants might have chosen to raise the prices given for the sale of the goods to a point which would have allowed of no overage, and that therefore the claim for damages, in so far as based upon the overage, is doubly uncertain from the faculty thus reserved to defendants to prevent the realization of any overage.
The answer to that suggestion is that this faculty was not reserved to defendants. Plaintiff explains in his testimony that with such a privilege reserved to defendants the contract would practically have been no contract, as the overage was the source from which the bulk of his remuneration was to *393 be derived; that with such a right reserved to the defendants he would not have accepted the contract at all. That without this overage, and even without the prospect of a considerable increase in the business of the defendants, the agency would have been less remunerative than one which he gave up for accepting it. We agree with him that the prices were fixed once for all. The contract reads that the prices were to be given, and they were given. This is not explicit or conclusive as to whether they were thus given once for all; but for the said reason given by plaintiff in his testimony, and for the reason that as thus fixed they were higher than defendants’ former prices, and afforded defendants a safer margin of profit, and for the further reason that they were adopted as minimum prices — the parties contemplating that there would be a margin, or overage, between them and the higher prices at which the sales would be made1 — the conclusion appears to us to be obvious that the intention was to establish the prices once for all.
Another suggested source of uncertainty is that the market might have fallen below these prices, and there is evidence that the agent of the corporation made somo sales below these prices. But this agent had no previous experience in this line, and sold the peppers as ordinary peppers, in competition with the ordinary peppers on the market; whereas, the products of defendants should have been kept out of competition with the ordinary peppers of the market, as plaintiff testifies, without contradiction, he had done, and would have continued to do. So that the sale of them at a profitable price was not dependent upon the conditions of the ordinary market, and it was this circumstance that had induced the plaintiff to give up the agency he had with another firm, and accept that with defendants.
[5] Another source of uncertainty is that the plaintiff might have died before the end of the full term of the contract, and he did die on September 23, 1919; and this, as a matter of course, put an end to the contract.
We find no good reason why the business could not have continued as it had done in the past; and why, therefore, the plaintiff, or his heir, who has been made a party to the suit, should not recover on that basis, but only for the time the contract would have continued, if defendants had not violated it — that is, up to the time of plaintiff’s death.
[6] No more than this can be allowed, for the defendants were under no obligation to increase their business; and, while there is evidence that the price of peppers was higher in the year 1916, the exact increment in the price is not shown; and non constat but that this increase in the year 1916 may not have been offset by a diminution for the rest of the time.
In the 17 months of its existence the agency yielded $2,100. The expenses incident to it amounted to $100, leaving $2,000 net. That sum, spread over the 17 months, would make $117.60 per month. The firm went out of business and terminated the agency at about the middle of April, 1916 — say, the 23d. From that date to that of the death of plaintiff would be 41 months; and this, at $117.60 per month, would make $4,821.60, for which the heir of plaintiff, who has been made a party to the suit, is entitled to judgment.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that plaintiff, Mrs. O. W. Chamberlain, have judgment against the defendants, I. Duncan Norwood and T. H. Rogers, in the sum of $4,821.60, with 5 per cent, per annum interest thereon from this date, and that the said defendants pay the costs of this suit.
O’NIELL, X, dissents.