# CHARLESTON.

GRIFFITH *et al. v.* BLACKWATER BOOM & LUMBER CO. *et al.*

Submitted September 15, 1898—Decided March 22, 1899.

1. CORPORATIONS—*Dissolution—Contracts.*

   When a corporation is forced into involuntary liquidation and dissolution, its executory contracts become nugatory. (p. 61).

2. CORPORATIONS—*Officers—Contracts.*

   Contracts between a corporation and its directors are voidable within a reasonable time. Executory contracts may be avoided before complete execution. (p. 65).

3. CORPORATIONS—*Officers—Contracts.*

   In the case of the avoidance of a partly performed executory contract made with a director, which is free from actual fraud or *mala fides*, the director is entitled to be compensated for the labor and money necessarily expended by him in part performance thereof. (p. 64).

4. CORPORATIONS—*Receiver—Contracts—Quantum Meruit.*

   A receiver, under the direction of the court, may adopt an executory contract, and require compliance therewith; and if such contract is afterwards found to be unfair and burdensome, and is abandoned and abrogated by order of the court, the contracting party is not entitled to damages as for a breach of such contract, but is only entitled to a just compensation for the actual expenditure of labor and money by him in fulfillment of his contract, subject to a deduction of all sums paid him thereunder; which compensation is entitled to a preference of payment out of the corporate assets in the hands of the receiver in equal priority with the other obligations of the receivership. (p. 65).

5. CORPORATIONS—*Receiver—Dissolution—Claims.*

   After the suspension by appointment of a receiver, and dissolution of a corporation, the receiver, or any stockholder, creditor, or other person in interest, may, in the corporate name, defend any doubtful claim presented for payment out of the assets of such corporation. Code, c. 53, s. 59. (p. 65).

6. Issue Out of Chancery—*Conflict of Evidence.*

In any pending chancery case, where an issue of fact is raised depending on a conflict of evidence on the demand of the parties in interest, it is proper for the court to direct such issue to be tried by a jury. *Alexander* v. *Davis*, 42 W. Va. 465. (p. 66).

Appeal from Circuit Court, Tucker County. ·

Bill by Catherine R. Griffith and others against the Blackwater Boom & Lumber Company and others. A decree was rendered, from which defendants appeal.

. *Reversed.*

C. Wood Dailey, P. J. Crogan, W. B. Maxwell, Benj. A. Richmond and L. D. Strader, for appellants.

William C. Clayton and Alston G. Dayton, for appellees.

Dent, President:

In the case of Catherine R. Griffith and others against the Blackwater Boom & Lumber Company and others, brought here on appeal from the circuit court of Tucker County, the three items of controversy are two thousand four hundred and seventy-eight dollars, fourteen thousand seven hundred and forty-nine dollars and thirty-four cents, and ninety-eight thousand six hundred and sixty-one dollars and fifty-six cents, adjudged to Albert Thompson by the decrees of August 24, 1896, and November 27, 1896,—the first two items being allowed as preferred liens on the assets of the Blackwater Boom & Lumber Company, under the control of the court, and the third rejected as a preferred lien, but allowed to share *pro rata* with the other claims decreed. The first is commission allowed for collecting the proceeds of lumber sales, the second is for labor done and expenses incurred on logging contract, and the third is damages for breach of such contract.

The appellee Thompson insisted that as to the last. item, being damages for breach of contract, for which, if he had been allowed to perform the same, he would have had a preferred lien on all the company's assets by virtue of section 7, chapter 75, Code, such damages should be allowed the same priority. The appellants, on the other hand, insist that neither of the items is entitled to prefer-

ence over the general creditors, and also dispute the right of recovery of any of them. Section 7, above referred to, is as follows: "Every mechanic, laborer, or other person who shall do or perform any work or labor by virtue of any contract for any incorporated company doing business in this State, shall have a lien for the value of such work or labor upon all the real estate and personal property of said company, and such lien shall have priority over any lien created by deed or otherwise on such real estate or personal property, subsequent to the time when the said labor was performed, but there shall be no priority of lien as between the parties claiming under the provisions of this section. * * *." This Court has held in the case of *Cushwa* v. *Improvement L. & B. Ass'n*, 45 W. Va. 490, that the word "performed" means "commenced," and that a laborer, after he has commenced to labor on his contract, has a lien for the full amount of his contract, whenever performed, superior to any lien created by deed or otherwise subsequent to such commencement. This certainly would seem to entitle a laborer to a lien for damages given him in lieu of profits on the work and labor that he failed to perform by reason of the breach of his contract by his employer. If he had completed his contract, these profits would have been a lien, and, there being no fault on his part they should stand on the same footing when allowed as damages. It is hardly necessary however to pass on this question finally in this case but it may be left for future consideration.

The facts necessary to determine the matters involved are as follows: The Blackwater Boom & Lumber Company was chartered on June 25, 1887, and began its short-lived career in Tucker County with the following board of directors: L. H. Hamilton, president, and C. R. Griffith, W. A. Griffith, John A. Rowland, and Albert Thompson. It ran along getting in debt and acquiring property, until the 24th of December, 1890, when it entered into a contract with Albert Thompson, then a director, to sell its output for five per centum commission, and collect the proceeds for one per centum, and it also entered into certain stocking contracts in which S. W. and Frank S. Thompson figured at first, but which finally devolved upon Albert Thompson. By these latter contracts all its timber was

to be cut, sawed into logs, and be delivered at the mill at certain fixed prices.    Albert Thompson, having obtained these contracts, by which he controlled the sale of the output and the delivery of the input of the mill, ceased to be a director; for he had the company between the upper and nether millstones, and could completely control or crush it at his pleasure.    The company finally became so deeply involved, and its creditors became so threatening, although its nominal assets were estimated to amount to two hundred and thirty-eight thousand eight hundred and ten dollars and ninety-eight cents, and its liabilities to only one hundred and twenty thousand six hundred and sixty dollars and ninety-two cents, that certain creditors and stockholders, with the assent of all others, either express or tacit, applied for and had a receiver appointed by the circuit court of Tucker County on the 10th day of March, 1893, to take charge of, manage, and administer the affairs of the company.    Such appointment vacated and annulled the sale and collection contract of Albert Thompson, but continued the stocking contract in force.    The principal mill of the company, styled Mill No. 1, was destroyed by fire on the 25th day of May, 1893, which was reported to the court; and on the 23d day of June, 1893, the court entered a decree, by consent of all the parties, directing sale of the company's property; it not being deemed advisable to continue the business any longer.    It was to be offered for sale in two ways, subject to and free from the stocking contract of Albert Thompson.    And on the 4th day of August, 1893, the receiver having reported that he had offered the property for sale as directed, and subject to the stocking contract of Albert Thompson it had brought seventy-two thousand five hundred dollars, and free from said contract it had brought one hundred and ten thousand dollars, the court confirmed the sale at the latter bid, thus abrogating the stocking contract; whereupon Albert Thompson filed his petition in the cause, asking that he be allowed damages by reason of the abrogation of his contract, claiming that the same justly amounted to the sum of one hundred thousand dollars, being the profits he would have realized if he had been permitted to carry out his contract according to its terms.    On the 14th day of August, 1895,

by leave of court, Albert Thompson filed an amended petition, claiming the sum of twelve thousand three hundred and ninety-nine dollars and sixty-three cents for work already performed under his contract, yet in an uncompleted state, by reason of the abrogation thereof.   Both of which sums he claimed to be prior liens on the company's assets by reason of the statute aforementioned.   These claims were contested by other creditors and stockholders, in the name of the company.   The matters were referred to a commissioner, and finally resulted in the appealed decrees.   The appellants assign the usual number of technical or shotgun reasons against these decrees, among which are want of proper parties to petitions, remedy at law, trial by jury, and *res adjudicata.*   In answer to these and other similar objections, it is sufficient to say that the court has taken entire control of the management and distribution of the assets of the company, and it was proper and right for Albert Thompson to present his claim or claims against such assets to. it for adjudicationn, and nowhere else; and, being a party to the suit, he had the right to do so by answer or petition, as all the parties in interest were already before the court, and had the right to contest or object to any claim presented in the corporate name, if necessary.   He was not seeking affirmative relief against any of the defendants, but, along with the other creditors, was seeking the appropriation and distribution of the assets among those entitled thereto.   The object of the petition was not to implead others but simply to call the attention of the court to the nature of the petitioner's claim that the court might ascertain, according to due process of law, the legality and justice thereof.   A trial by jury should have been had if properly demanded by the parties in interest.   *Alexander* v. *Davis*, 42 W. Va. 465, (26 S. E. 291); *Pickens* v. *McCoy*, 24 W. Va,. 344; *Setzer* v. *Beale*, 19 W. Va. 274; *Anderson* v. *Crammer*, 11 W. Va. 562; *Nease* v. *Capehart*, 8 W. Va. 95; *Powell* v. *Barton*, 4 W. Va. 610.   *Res adjudicata* does not arise, for the reason the court still reserves control of the funds, and had only made a partial distribution thereof.   'The last report of the receiver shows that, if the three contested claims of Albert Thompson are allowed, the assets

of the company will greatly fall short of the liabilities; but, if such claims are disallowed, there will be in the neighborhood of thirty thousand dollars to be distributed among the stockholders.  So these amounts are of very grave importance to the stockholders, Albert Thompson and the other creditors.   The most important of which is his right to recover the alleged profits of his abrogated contract by way of damages ascertained by the final decree to amount to ninety-eight thousand six hundred and sixty-one dollars and fifty-six cents, as of the 24th day of November, 1896.   These damages are claimed by reason of an alleged breach of its contract by the company.  This, however, is a legal impossibility, for the reason that, at the time the alleged breach occurred, the company had ceased to exist save only in name, and its bones were already bleaching on the plains of corporate existence amid millions of their kind.   By force of law it had been compelled to surrender its franchises into the hands of a receiver on account of its inability to further carry on its business, without great threatened loss to its creditors and stockholders, and it was afterwards finally dissolved by the disposal of all its property, to all which Albert Thompson was present and gave his assent, with certain reservations in his own interest.   Where an insolvent corporation is forced into liquidation and dissolution all its executory contracts perish with it, for this is an implied condition of their execution.

In 7 Am. & Eng. Enc. Law (2d Edit.) 116, the law is stated to be, "When performance of a contract is dependent upon the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation."   The continued existence of the corporation was assumed as the basis of the contract with Albert Thompson, and its involuntary dissolution puts an end to performance on its part, and the contract ceased to be binding, as there was no one left to perform it according to its terms.   *People v. Globe Mut. Life Ins. Co.*, 91 N. Y. 174, (1 Am. & Eng. Corp. Cas. 586, note 594).   Such, however, is not the law where a solvent corporation is voluntarily dissolved.   By

its own act it cannot relieve·itself from its contracts, but its assets will be held liable for breaches thereof. It must be taken as an implied condition of all such contracts that such corporation will not voluntarily try to escape or evade fulfillment, and, if it does, equity will not recognize its dissolution, nor premit the distribution of its assets until its contracts are satisfied.  *Glass Co.* v. *Stoher,* 54 Ohio St. 157, (43 N. E. 279;) *Schleider* v. *Delman,* 44 La. Ann. 462, (10 South 934). The appellee Thompson claims that the dissolution of the corporation was voluntarily, for the reason that the officers assented thereto.  They assented because its business had assumed such a condition that it could not be continued without great loss to its creditors and stockholders.  And to this the appellee Thompson also assented.  Hence its dissolution was not voluntary, but was brought about by the force of circumstances, and the final determination of its affairs shows that it was not solvent.  But there was no breach of the contract at the time of the suspension of its corporate powers, and a receiver was placed in charge of its affairs.  The breach did not come until later, when, on the report of the sale of its property, it was found that it was in a condition of insolvency, especially if the sale should be made without a breach of the stocking contract.  Therefore the breach was not committed by the corporation, but by the court after it had directed its receiver to carry out the contract.  So in no event can we hold that there was a breach on the part of the corporation prior to its suspension and dissolution.  Nor are its assets liable for the breach of the contract committed by the receiver acting under direction of the court.  A receiver is not bound to carry out the executory contracts of the corporation, but he may disregard them.  Beach, Rec. §. 328.  The power to adopt or reject the defendant's contract, to accept those which are of advantage to the trust estate, and reject the burdensome ones, is restricted to the receiver.  The rule is not reciprocal, hence is called "anomalous."  Section cited.

"The court, however, may order the receiver to complete unfinished contracts, if by so doing the interests of all parties will be better conserved, and in such case whatever

is done by the receiver in the performance of such con-
tracts becomes an obligation upon the receivership and its
property, to be protected by the court." Smith, Rec. pp.
102, 103, § 35. The receiver in this case did adopt, under
the instruction of the court, and partly carry out, the
stocking contract; but finally the court, reaching the con-
clusion, with the assent of all parties, except Albert
Thompson, determined to and did abandon the stocking
contract, and direct a sale of the property. This the court
had the legal and equitable power to do. It thereby deter-
mined that the carrying out of the contract would be in-
jurious to those in interest. After this action on the part
of the court, the corporation, the receiver, or Albert
Thompson would be in contempt even in seeking to carry
out the same. The court reached this conclusion after
the attempted sale proved the contract a weighty incubus
on the corporate assets. Relieved of it, the property
brought one hundred and ten thousand dollars; subject to
it, it brought seventy-two thousand five hundred dollars,
—making a difference of thirty-seven thousand five hun-
dred dollars, or exceeding thirty-three per centum, that
the value of the property was diminished in open market
by reason of this contract, showing how detrimental it was
to the interest of the corporation. If the contract had
been just and fair, it should have increased, instead of di-
minished, the value of the property. Its unfairness oper-
ated as a lever to destroy the value, and produce a sacrifice
of the subject-matter thereof; and the court could not do
otherwise than disregard the contract, and confirm the
sale free therefrom, although the contract was thereby
rendered nugatory. The offer of the property, subject
to the contract, was a mere concession to Albert Thomp-
son, and was in no sense a recognition of his right to en-
force the same or to recover damages in lieu thereof, but
it afforded the court a means of determining the probable
value thereof to the corporate creditors and stockholders.
The result was disastrous. The fact that this stocking
contract was an executory contract, and perished with the
involuntary dissolution of the corporation, is not the only
reason that the court was justified in treating it as nuga-
tory, but it was entered into by Albert Thompson with the

other officers of the corporation while he was holding the position of a director, and it was therefore voidable at the instance of the stockholders at any time before it was completely executed. It is claimed that the proper corporate authority neither authorized nor ratified this contract. In the case of *Limer* v. *Trader's Co.*, 44 W. Va. 175, (28 S. E. 730), it was held: "'The directors of a corporation cannot separately and individually give consent to or make a contract to bind the corporation. They can act only as a board, their power being not joint and several, but only joint." And this complies with the provisions of our statute law under which such corporations are created. It requires the same action to afterwards ratify as to authorize a contract in the first instance. To the extent, however, that an executory contract has been executed, a court of equity will enforce it on the theory that he who asks equity should do equity, and that no one is entitled to the labor and money of another without compensation, unless *mala fides* or fraudulent interest exists; thus preventing the interference of equity. "A contract by which a director uses his official power and influence to his own personal advantage, or to the advantage of third persons, and to the disadvantage of the corporation, is immoral and corrupt, in the sense that it will not be judicially enforced, but it will be relieved against at the suit of the company or its stockholders." 3 Thomp. Corp. § 4022. Nor does the fact that Albert Thompson afterwards resigned his directorship change the nature of the contracts obtained by him when director. For having obtained these contracts by which he rendered the corporation a mere bagatelle under his control, if they were enforceable according to their tenor and effect, he could well afford to resign. While it was the shadow, he was the substance. He held the power of life and death over it, and it really continued in name only. His profits, according to his own showing, were to be not less than fifteen thousand dollars per annum under his stocking contracts, and five thousand dollars per annum on sales. Its profits wholly depended on sales to be made by him. These contracts were not only to his own personal advantage, but to the great disadvantage of the corporation. He gradually

.tightened his grip upon it, forced it to suspend, to which he assented, and now seeks to consume its assets by way of damages in lieu of profits for an alleged breach of his contracts, and asks the assistance of a court of equity to sustain this unconscionable demand. In 3 Thomp. Corp. § 4061, it is said: "Another, and perhaps more practicable, view, and the one which generally prevails in the American courts, is that a contract between a corporation and its officers is not void *per se*, but is merely voidable at the option of the corporation or its representative, provided the option is exercised within a reasonable time under the circuumstances of the case. * * * Such a contract is, however, valid and enforceable as to others, but it may be repudiated by the company at the instance of a stockholder." This more especially relates to executed contracts. The reasonable time mentioned as to executory contracts would be before they become executed. A partly executed executory contract could be avoided before its final execution, but the executing party thereto should be placed in *statu quo*, in absence of fraud, by compensation in the nature of a *quantum meruit* for money and labor expended under such contract. *Id.* § 4026. There is no doubt, therefore, that the corporation had the right to avoid its contracts with Albert Thompson at any time before final execution and to the extent they remained unexecuted. The corporation having the right to do so, the court and its receiver succeeded to these rights. Having partly executed his contracts, Albert Thompson is entitled to recover a just and reasonable compensention for the necessary expenditure of labor and money under his stocking contract, less the sums paid him; but he is not entitled to recover the large profits claimed by him. As the sum of fourteen thousand seven hundred and fortynine dollars and thirty-four cents is an alleged part of such expenditure, it should not have been decreed until the true amount thereof had been ascertained and determined. This amount, when ascertained and determined, by reason of the adoption of the stocking contract by the receiver, under direction of the court, and thereby preventing Albert Thompson from perfecting his statutory lien therefor, under section 8, chapter 75, Code, will be a prior lien

on the assets of the corporation in the hands of the receiver. Smith, Rec. p. 102, § 35. The sum of two thousand four hundred and seventy-eight dollars, being one *per centum* on sales for collection, allowed Albert Thompson as a preferred lien, is a mere matter of unearned profits on a voidable contract, and which was avoided by the corporation by its president, L. Hamilton, before the same accrued, with the concurrence of Robert G. McKay, agent of Albert Thompson. It is true that Albert Thompson repudiated the agency of McKay; but the corporation, or its receiver, acting in behalf of creditors and stockholders had the right to avoid such contract, because the same was entered into with the corporation at the time Albert Thompson was a director thereof. The contract being out of the way, he is only entitled to recover a reasonable and just compensation for selling and collecting the proceeds, which the preponderance of the proof limits to five *per centum*. This amount he has already received. His claim for the one *per centum* should have been disallowed.

The decrees complained of, therefore, must be wholly reversed and annulled, and this cause be remanded to the circuit court, with directions by reference to a commissioner, or, if the parties in interest require it, by the impaneling of a jury, to ascertain a just and reasonable compensation to Albert Thompson for the necessary expenditure of labor and money in the part performance of his stocking contract, deducting therefrom all sums heretofore received by him on account thereof; which balance, if any, so ascertained shall be decreed a lien first in priority on the corporate assets in the hands of the receiver, and to be further proceeded in according to the rules and principles governing courts of equity.

*Reversed.*