## 19460

C. N. TALBOT and Lula E. Talbot, Appellants, v. W. A. JAMES, Individually, and as President of Chicora Apartments, Inc., and Chicora Apartments, Inc., Respondents.

(190 S. E. (2d) 759)

75

*Messrs. Howell V. Bellamy, Jr.,* and *J. M. Long, Sr.,* of Myrtle Beach, *for Plantiffs-Appellants,*

*James P. Stevens, Esq.,* of *Stevens & Holt,* Loris, *for Defendants-Respondents,*

*Messrs. Howard V. Bellamy, Jr.,* and *J. M. Long, Sr.,* of Myrtle Beach, *for Plaintiffs-Appellants,*

August 1, 1972.

Moss, Chief Justice:

This equitable action was brought by C. N. Talbot and Lula E. Talbot, appellants herein, against W. A. James, individually, and as President of Chicora Apartments, Inc., and Chicora Apartments, Inc., respondents herein, for an accounting. In the complaint it is alleged that W. A. James, as an officer and director of the Corporation, violated his fiduciary relationship to the Corporation and the appellants as stockholders thereof, by diverting specific funds to himself.

The respondents, by answer, denied the allegations of the complaint and alleged that W. A. James had received no funds from the Corporation except for the sums paid for the erection of Chicora Apartments, pursuant to a contract between Chicora Apartments, Inc., and the said W. A. James.

The case was referred to the Master in Equity for Horry County, who after taking the testimony, filed a report in which he found that W. A. James was not entitled to general overhead expense and profits arising out of the construction contract with Chicora Apartments, Inc., and recommended judgment in favor of Chicora Apartments, Inc., against him in the amount of $25,025.31.

The respondents timely appealed from the recommendations contained in the Report of the Master. The appeal was heard by the Honorable Dan F. Laney, Jr., presiding judge, and he issued his order reversing the findings of the Master and ordered judgment in favor of the respondents. This appeal followed.

This being an equity case and the Master and the Circuit Judge having disagreed and made contrary findings on the material issues in the case, this Court has jurisdiction to consider the evidence and make findings in accordance with our view of the preponderance or

greater weight of the evidence. *Gantt v. Van Der Hoek,* 251 S. C. 307, 162 S. E. (2d) 267.

Lula E. Talbot owned a tract of land fronting on U. S. Highway 17, in Myrtle Beach, South Carolina. The title thereto was conveyed to her by her husband, C. N. Talbot. The appellants were approached by W. A. James with a proposal that the tract of land be used for the erection thereon of an apartment complex. After preliminary talks and negotiations, the parties on January 12, 1963, entered into a written agreement thereabout. Basically, the parties agreed to form a Corporation to construct and operate an apartment complex. Lula E. Talbot was to convey to said Corporation the tract of land owned by her and W. A. James agreed, as set forth in paragraph 5, of said contract,

"To promote the project aforementioned and shall be responsible for the planning, architectural work, construction, landscaping, legal fees, and loan processing of the entire project, same to contain at least fifty (50) one, two and three room air conditioned apartments for customer as approved by FHA appraisers."

It was further agreed that upon the formation of the Corporation that the appellants were to receive 50% of the stock of the Corporation in consideration for their transfer of the land to it. This was to be the absolute limit of the contribution of the appellants. W. A. James was to receive 50% of the stock of the Corporation in consideration of his efforts on its behalf.

It appears, that after the aforementioned contract was entered into, that W. A. James obtained the services of an architectural firm on a contingency basis and preliminary plans and sketches of the proposed apartment complex were made by such firm. James was also successful in obtaining commitments from the Federal Housing Administration and from an acceptable mortgagee with regard to financing. These commitments having been obtained, a corporation was formed to be known as Chicora Apartments, Inc., and

a charter was duly issued by the Secretary of State on November 5, 1963.

Pursuant to the terms of the agreement dated January 12, 1963, 20 shares of no par value capital stock were issued, with W. A. James receiving 10 shares, C. N. Talbot one share and Lula E. Talbot 9 shares. At an organizational meeting of the corporation W. A. James was elected president, his wife, B. N. James, was elected secretary, C. N. Talbot was elected vice president, and Lula E. Talbot was elected treasurer. W. A. James and C. N. Talbot were elected as directors of the Corporation.

At a meeting of the Board of Directors held on November 5, 1963, a resolution was adopted accepting the offer of Lula E. Talbot to transfer the tract of land in question to Chicora Apartments, Inc., in exchange for 10 shares of the no par value capital stock thereof. In the said resolution, it was declared that the said property, to be so transferred, was of a value of $44,000.00. At the same meeting, a resolution was adopted accepting the offer of W. A. James to transfer to Chicora Apartments, Inc., in exchange for 10 shares of the no par value stock thereof, at a valuation of $44,000.00 the following:

"1. FHA Commitment issued pursuant to Title 2, Section 207 of the National Housing Act, whereby the FHA agrees to insure a mortgage loan in the amount of $850,-700.00, on a parcel of land in Myrtle Beach, South Carolina, more particularly described in Schedule 'A' hereto attached, provided 66 apartment units are constructed thereon in accordance with plans and specifications as prepared by Lyles, Bissett, Carlisle & Wolff, Architects-Engineers, of Columbia, South Carolina.

"2. Commitment from United Mortgagee Servicing Corp. agreeing to make a mortgage loan on said property in the amount of $850,700.00 and also commitment from said mortgagee to make an interim construction loan in an identical amount.

"3. Certain contracts and agreements which W. A. James over the past two years have worked out and developed in connection with the architectural and construction services required for said project.

"4. The use of the finances and credit of W. A. James during the past two years (and including the construction period) in order to make it possible to proceed with the project."

The day following the election of the officers and the issuance of the capital stock, the Board of Directors of Chicora Apartments, Inc., met in Columbia, South Carolina, and passed a resolution authorizing the Corporation to borrow from United Mortgagee Servicing Corporation of Norfolk, Virginia, the sum of $850,700.00, upon the terms stated, said loan to be insured with the Federal Housing Administration. It was further resolved:

"That the President of the corporation, W. A. James, be authorized, empowered and directed to make, execute and deliver such documents and instruments as are required by the F. H. A. and the lender, in order to close the loan transaction; said documents including but not limited to, note, mortgage, Building Loan Agreement, Construction Contract, Architect's Agreement, Mortgagor's Certificate, Regulatory Agreement, Mortgagor's Oath and Agreement and Certificate."

The record shows that on November 6, 1963, James Construction Company entered into a construction contract with Chicora Apartments, Inc. This contract was executed by W. A. James, as president, and attested by B. N. James, secretary, on behalf of Chicora Apartments, Inc., and by W. A. James, sole proprietor, for James Construction Company. The contract sum was to be the actual cost of construction plus a fee equal to $20,000.00 but in no event was the contract price, including the fee, to exceed $736,000.00. Attached to the contract was a "Trade Payment Breakdown" which made an allowance for overhead expenses in

the amount of $31,589.00, but, this said sum was to be paid by means other than cash. The aforementioned loan was obtained and the apartment complex was constructed. All funds from the mortgage loan were received and disbursed by W. A. James and the renting of the apartments was begun, such being conducted by a resident manager, who was an employee of the Corporation.

It appears, that in 1968, an accountant, who was employed by the corporation, advised James and C. N. Talbot that it was in financial straits. It was at this time that the appellants questioned the disbursement of the mortgage funds by W. A. James. Their demands to examine the corporate records were refused by James. Thereafter, an order was obtained from the Honorable James B. Morrison, Resident Judge of the Fifteenth Judicial Circuit, making available the corporate records to the appellants. This action was thereafter instituted.

The record in this case clearly shows that W. A. James personally received or there was paid for his benefit the sum of $25,025.31 from the proceeds of the mortgage loan. He received this directly or by payments of his own personal debts by the corporation. He contends that he was entitled to these funds and more under the construction contract which he had with Chicora Apartments, Inc. This raises the question of whether James, who was a stockholder, officer, and director of Chicora Apartments, Inc., could enter into a contract with himself as an individual and made a profit therefrom for himself.

The Master found that Chicora Apartments, Inc., through W. A. James as president thereof, entered into a contract with himself, as sole proprietor of James Construction Company, without disclosing his identity of interest to the other officers or stockholders of the corporation, and that such contract has not been acquiesced in or ratified by the other director, officers or stockholders. He further found that the initial agreement between the parties required W. A. James

to perform the same duties that he later contractd with the corporation to perform and for which he now seeks to justify the payment to him from the mortgage funds of the corporation. It was also found that according to the initial agreement these services were to be performed and, in consideration of such performance, James was to receive one-half of the shares of the capital stock of Chicora Apartments, Inc. The trial judge, upon exceptions to the Master's Report, made contrary findings of fact and reversed the Master and entered judgment in favor of the respondents.

The first question for determination is whether the fiduciary relationship existing between W. A. James as a stockholder, officer and director of Chicora Apartments, Inc., prevented him from contracting with the said corporation for his profit without first having disclosed the terms of the contract to the disinterested officers and directors of the corporation.

The officers and directors of the corporation stand in a fiduciary relationship to the individual stockholders and in every instance must make a full disclosure of all relevant facts when entering into a contract with said corporation. *Jacobson v. Yaschik,* 249 S. C. 577, 155 S. E. (2d) 601. The object of this rule is to prevent directors from secretly using their fiduciary positions to their own advantage and to the detriment of the corporation and of the stockholders.

The cases of *Peurifoy v. Loyal,* 154 S. C. 267, 151 S. E. 579, and *Fidelity Fire Ins. Co. v. Harby,* 156 S. C. 238, 153 S. E. 141, firmly establish the ineligibility of a director to participate in corporate action with respect to a transaction in which he has an interest adverse to the corporation. He may not even be counted to make a quorum at a meeting where the matter is acted upon, which is the general rule.

The case of *Gilbert v. McLeod Infirmary,* 219 S. C. 174, 64 S. E. (2d) 524, contains a good statement of the law

relating to personal dealings of an officer or director with his corporation or its property. We quote the following from this case:

"From the extensive review of the authorities there is extracted the rule that when a director, in selling corporate property to himself, represents or joins in the representation of the corporation, the transaction is voidable at the option of the corporation, or others suing in its behalf, merely upon proof of the fact stated; but when the purchasing director abstains from participation in behalf of the corporation and it is properly represented by others who are personally disinterested, the transaction will stand under attack if the director made full disclosure, paid full value, and the corporation has not been imposed upon; and the burden is upon the director to establish these requisites by evidence."

We quote again from the *Gilbert* case the following:

"A director or officer of a corporation is not absolutely precluded by his official position from dealing or entering into a contract with the corporation, nor is such a transaction void *per se*. While it is true, on the one hand, that where the directors or officers of a corporation deal with themselves as individuals, the transactions are subject to the closest scrutiny, under the most searching light of truth, and must be characterized by absolute good faith, it is also true, on the other hand, that where persons holding positions of trust and confidence in a corporation deal with the corporation, which is also represented by others, in entire good faith, fairness, and honesty, such transactions are not invalid and will be upheld. It would also seem that the mere fact that a director with whom the contract was made voted at the directors' meeting authorizing the same would not necessarily invalidate the contract, where the disinterested directors, who themselves constituted a quorum, were unanimous in the action." 13 Am. Jur. 958, sec. 1005.

We point out that in the *Gilbert* case a director of a corporation was purchasing from it corporate property. The rationale of the rule stated in *Gilbert* is ap-

plicable to the situation where a director is entering into a contract individually with the corporation.

We examined the evidence in this case in the light of the foregoing rules. The testimony of C. N. Talbot is that he discussed with James as to who was going to construct the Chicora Apartments and was told that Dargan Construction Company was going to take the contract. He further testified that during the period of construction he saw Dargan Construction Company signs on the premises and also trucks bearing its name. This witness further testified that James never discussed with him or his wife the matter of his constructing the apartments. Talbot denied that he knew that James was to be the contractor.

James testified that he explained to C. N. Talbot that the only possible way that the apartments could be built without putting in money was that he be the building contractor. James further testified that the only way the project could survive and the only way that "we" could get the builder's equity was that he should be the builder. He says that everybody understood that because his attorney had explained it at a meeting of the directors.

Assuming that James revealed to Talbot that he was to be the building contractor for the Chicora Apartments complex, his testimony does not show that he disclosed his entitlement to a fee of $20,000.00 and an allowance for overhead expenses in the amount of $31,589.00. It is thus apparent that he did not make a full disclosure of the profits or monetary benefits that he was to receive under the terms of the contract. It was his duty to make such full disclosure and the burden of proof was upon him to show that such had been done.

We have carefully examined the minutes of the several meetings of the stockholders and directors of the corporation. We find from such examination that they reflect each and every detail and transaction looking toward the construction of the apartment complex but nowhere in said

minutes is there any mention that James was to be the building contractor. The minutes reflect that there was a meeting of the directors of the corporation on November 6, 1963, and a resolution adopted at such meeting authorizing the borrowing of the sum of $850,700.00 from the United Mortgagee Servicing Corporation, and authorizing James, as president, to make, execute and deliver such documents and instruments as were required by the FHA and the lender. If James was to be the building contractor and such was discussed at this meeting, as he contends, the minutes should have reflected such, particularly in view of the fact that the building contract was being awarded to him when he was a director and president of the corporation. There is no explanation of why such a resolution or authorization was not considered or passed at this meeting of the Board of Directors.

The record shows that the appellants were stockholders and officers of the corporation. As such, they were entitled to inspect the books of the corporation at any and all times. Section 12-263 of the Code. When they demanded their right to exercise this privilege, such was refused by James and they only obtained the right to inspect the records and books of the corporation by an order of the court. James' only explanation was that the Talbots were not entitled to see the books. It is inferable from this action on the part of James that he did not want the appellants to discover how the funds of the corporation had been disbursed and see that he had received benefit in such disbursement.

It appears that at the meeting of the directors of the corporation held on November 6, 1963, W. A. James, as president, was authorized to execute and deliver several documents including a "construction contract." The respondents argue that this gave W. A. James the authority to make the construction contract here involved. It is true that he was authorized to sign a "construction contract" on behalf of the corporation but such resolu-

tion did not authorize him to sign one on behalf of the corporation in favor of himself individually.

The respondents contend and place great emphasis on the fact that the construction contract was approved by the Federal Housing Administration and the fees provided therein were allowed by it. This has no relevancy to the issue here.

Considering the entire record in this case, it is our conclusion that W. A. James, as president of Chicora Apartments, Inc., entered into a contract with himself as sole proprietor of James Construction Company without making full disclosure of his identity of interest to the other officers and stockholders of the corporation. In this conclusion, we agree with the findings of the Master. It follows that the Chicora Apartments, Inc., is entitled to judgment against the said W. A. James in the amount of $25,025.31, this being the amount of the corporate funds received by or paid in behalf of W. A. James.

The Master found that under the language in paragraph 5 of the pre-incorporation agreement, hereinbefore quoted, that W. A. James was to be responsible for overseeing, supervising and generally managing all aspects of the construction of the apartment complex. He found that W. A. James, as sole proprietor of James Construction Company, performed the contract obligations and for such he received one-half of the shares of the capital stock of Chicora Apartments, Inc. The trial judge reversed this finding of the Master. The appellants allege error.

James testified that he was the general contractor for the construction of the apartment complex. He testified further that the apartment complex was constructed by some eighteen to twenty subcontractors with whom he negotiated contracts. The record reveals that the only service that James rendered in connection with the construction of the apartment complex was supervisory. These duties were those contemplated by the pre-incorporation agreement of the parties. He was compensated for these

services when he received one-half of the capital stock in the corporation. He was not entitled to any other compensation for the services rendered. We think the trial judge was in error in not so holding.

The order of the trial judge is reversed and this case remanded to the Court of Common Pleas for Horry County for an appropriate order to effectuate the views herein expressed.

Reversed and remanded.

LEWIS and LITTLEJOHN, JJ., concur.

BUSSEY and BRAILSFORD, JJ., dissent.

BUSSEY, Justice (dissenting):

While admittedly there is some evidence tending to support the findings of fact by the master, adopted in the majority opinion, I have concluded after considerable study of the record and exhibits that the clear weight of the evidence preponderates in favor of the findings of fact by the circuit judge rather than those of the master. Being of this view, I am compelled to dissent.

The apartment complex was completed in July 1964, whereupon the plaintiff, C. N. Talbot, with the help of a resident manager, selected by him but approved by James, took charge of the management and operation of the apartment complex, all receipts being deposited by Talbot and all checks being written by Talbot. In 1968, after Talbot and his manager had been in charge of the apartment complex for nearly four years, the corporation was virtually insolvent and the recommendation of Talbot's auditor was that the project be surrendered to FHA as a failure. To this James did not agree; instead he took charge of the operation of the apartment complex himself for the corporation, and a little more than a year later the corporation had seventeen to eighteen thousand dollars in the bank with all current bills paid.

Talbot was obviously chagrined at this course of events and it was not until after he was ousted from management that he actively asserted any claim on behalf of the corporation against James. While he denied knowing that James Construction Company was the general contractor on the project, by his own testimony about January or February 1965 he knew that a check for more than fifteen thousand dollars had been drawn on the construction account for the benefit of James. There is no suggestion that he then made any issue thereabout; instead, he waited until nearly four years later and until after he had been ousted from the active management of the operation.

Again, while denying knowledge of the contract, he offered in evidence Plaintiff's Exhibit No. 5, General Contractor's and Subcontractor's Statement, dated November 6, 1963, which clearly shows the general contractor to be James Construction Company; the cash amount of the general contract to be $716,000, plus a cash fee of $20,000. When asked where he got Exhibit 5, he said from Mr. Barnes, the attorney in Columbia who handled the FHA loan application for the corporation. The evidence rather clearly shows that all papers in connection with the FHA loan, application, mortgage, corporate minutes, resolutions, etc., were prepared by Mr. Barnes and were before the meeting in Columbia on November 6, when and where Talbot was present. There is nothing anywhere in the record from which it could be inferred that there was anything at all secretive about the preparation and execution of the general construction contract between Chicora and James Construction Company, it having been prepared by Mr. Barnes and, on its face, executed at the same time and place as the resolution which authorized James to execute the construction contract on behalf of the corporation, all in the presence of Talbot.

Talbot by his own testimony made no effort to acquaint himself with the contents of the various documents then before the meeting and testified that they were so voluminous it would have taken him thirty days to read them. All of

Talbot's testimony, in my judgment, has to be weighed in the light of the fact that he asserted no claim against James until after he became disgruntled at his failure to make a success of the operation of the project and at not having been able to draw any income or profit therefrom. Much of his testimony was addressed to the totally untenable position, rejected by the master and not further pursued, that James was bound to personally pay various and sundry fees, the payment of which by James was obviously not within the contemplation of the parties, and, if paid by James, would have resulted in him having contributed to the venture far in excess of anything contributed by the Talbots.

The resolution of the Board of Directors at the meeting on November 5, 1963, unanimously confirmed by the meeting of the stockholders on the same date, as evidenced by their written signatures, clearly shows that all parties agreed that James' efforts over a two year period and the contracts and commitments thereby produced plus the continued use of the finances and credit of James during the actual construction period represented a value of $44,000, which was accepted in full payment for James' ten shares of stock. According to the literal terms of this resolution, nothing remained to be done by James to fully earn his ten shares except allow the use of his credit throughout the construction period. As president of the corporation, he would have been expected to at least reasonably supervise the construction of the project in the interest of the corporation, whether or not required to do so by either the resolution of November 5 or the pre-incorporation agreement between the parties. The general supervisory duties of a corporation president or a pre-incorporation promoter are a far cry from the arduous, time consuming and expensive duties of a general contractor.

Supervising a general contractor is one thing; while acting as a general contractor, engaging, supervising, and following up eighteen or twenty subcontractors is an entirely different thing. There is uncontradicted evidence of volumin-

ous paper work, record keeping, reports, etc., on the part of James and his personnel in the performance of the general construction contract. The record leaves no doubt whatever, to my mind, that James Construction Company performed services to the corporation subsequent to November 5, 1963 far over and above the service contemplated by either the aforesaid resolution or the pre-incorporation agreement.

As mentioned in the majority opinion, the "Trade Payment Breakdown" attached to the approved FHA construction contract made an allowance for overhead expenses in the amount of $31,589, payable by means other than cash. Apparently from the evidence, this amount, otherwise drawable, as overhead by James, was to form a part of the equity of the corporation required for the FHA loan and, of course, not actually received by James. Aside, however, from this item, the record reflects that where, as here, there was an identity of interest between the contractor and the sponsor, FHA, within certain limitations, permitted the contractor to include in his certification of the actual cost of a project a reasonable allocation of his general overhead expense, *i.e.,* the proportion of his actual general overhead expense attributable to the particular contract job.

In his cost certification to FHA James showed the entire overhead of James Construction Company during the period that the apartment project was under construction, and represented that 88.98% thereof, or $22,817.34, was attributable to the construction of Chicora Apartments. Of this amount, FHA allowed only $21,231.90 (3% of other costs) as a portion of the actual cost of Chicora Apartments. James' figures as to his overhead and the portion thereof attributable to the construction of Chicora Apartments may or may not have been accurate, but he was not even cross-examined thereabout. Assuming the accuracy of his figures it follows that his net profit from this general construction contract was the sum of $25,025.31 less $22,817.34 overhead, or $2,207.97. Even Talbot had to frankly admit that he did not know of any loss suffered by the Talbots or the

corporation as a result of the general contract being let to James. He tacitly, if not expressly, conceded that Dargan, or any other reputable contractor, would have cost the corporation some twenty-five or thirty thousand dollars more.

In summary, I conclude that the following facts are established by the clear preponderance of the evidence:

1. Mrs. Talbot left largely to her husband the handling of her interest in the corporation, except when called upon to sign any document.

2. Talbot, individually and as the agent of Mrs. Talbot, knew on November 6, 1963 that James Construction Company was going to be the general contractor on the project and, moreover, that the project could not otherwise successfully be pursued. He may not have known all of the details of the contract, but any lack of knowledge on his part was attributable to his lack of diligence or interest and not to any intentional failure to disclose by James.

3. That the corporation clearly benefited from the contract being let to James and suffered no detriment whatever therefrom.

4. That the services performed and the overhead incurred by James as general contractor were in addition to anything required of him under the pre-incorporation agreement or the corporate resolution of November 5, 1963 authorizing the issuance of his shares of stock to him. James actually received little profit from the contract, as opposed to overhead expense, most of what a contractor normally would receive as profit having been left in the corporation to make up the equity necessary to comply with FHA requirements.

Under the facts as I see them and find them to be, I do not think that the building contract was voidable but even if it were, what relief may be properly granted at this late date? The contract is fully performed and its rescission is now impossible. Any recovery by the corporation must rest upon the principle that it suffered loss in one way or another as

a result of the alleged unauthorized act of James. The weight of the evidence clearly reflects that the corporation was benefited rather than being damaged. Even assuming voidability initially, in the absence of actual fraud or bad faith, under the weight of authority James would still be entitled to be compensated for the labor and money necessarily expended by him in the performance of the contract. 19 C. J. S. Corporation § 783, p. 159; *Griffith v. Blackwater Boom & Lumber Co.*, 46 W. Va. 56, 33 S. E. 125.

For the foregoing reasons, I would affirm the judgment of the lower court, but at the very least, if the corporation is to recover at all from James, its recovery should be limited to any profit actually received, as opposed to his overhead expense. If the judgment below be not affirmed, the cause should be remanded for the purpose of determining the amount of actual overhead which James should equitably be allowed to retain.

BRAILSFORD, J., concurs.