**Libby G. LYNCH, Plaintiff Below, Appellant,**

v.

**VICKERS ENERGY CORPORATION et al., Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted April 19, 1977.

Decided Oct. 18, 1977.

Rehearing Denied Feb. 3, 1978.

Joseph A. Rosenthal of Morris & Rosenthal, Wilmington, and Sidney B. Silverman, Joan T. Harnes and Martin H. Olesh of Silverman & Harnes, New York City, of counsel, for plaintiff-appellant.

Louis J. Finger of Richards, Layton & Finger, Wilmington, and Robert L. Stern, Leo Herzel, Susan Getzendanner and John R. Schmidt of Mayer, Brown & Platt, Chica-

go, Ill., of counsel, for defendants-appellees Vickers Energy Corp., Esmark Inc., Richard J. Boushka, Donald P. Kelly, Robert D. Phillips and Jack A. Vickers.

David A. Drexler of Morris, Nichols, Arsht & Tunnell, Wilmington, and William Key Wilde of Bracewell & Patterson, Houston, Tex., of counsel, for defendants-appellees William A. Alexander, Edward J. Hudson and Stormy F. Smith.

Before HERRMANN, C. J., and DUFFY and McNEILLY, JJ.

DUFFY, Justice:

In this tender offer case, plaintiff, a former shareholder of TransOcean Oil, Inc. (TransOcean), filed a class action in the Court of Chancery seeking damages from defendants, Vickers Energy Corporation (Vickers), Esmark Inc. (Esmark), and the directors of TransOcean. Both corporate defendants are chartered in Delaware. After trial, judgment was entered for defendants and this appeal followed.

I

Briefly, the relevant facts are these:[1]

On September 30, 1974, Vickers, a wholly-owned subsidiary of Esmark, made an offer to purchase all outstanding TransOcean common stock at a price of $12 per share. At the time of the tender offer, Vickers held 53.5% of TransOcean's issued and outstanding common shares.

As a result of the offer, Vickers acquired 4,228,141 of the 5,888,999 shares held by others, thus elevating its interest in TransOcean to some 87%. Plaintiff tendered her 100 shares in response to the offer.

Thereafter, plaintiff filed this action for herself and other TransOcean minority shareholders of her class charging defendants with violation of their fiduciary duties in that they: (1) made less than a full and frank disclosure in the tender offer of the value of TransOcean's net assets; and (2) coerced the minority shareholders, through use of their superior bargaining position and control over the corporate assets and processes, to sell their respective shares for a grossly inadequate price. Plaintiff seeks damages based on the difference between the tender offer price and the fair value of a share.

After trial on the merits, the Court entered judgment for defendants, ruling that plaintiff had failed to prove either actionable coercion or fraudulent misrepresentation; the Court concluded, in essence, that plaintiff was asking for appraisal rights in the context of a tender offer, a form of relief "not provided for in the Delaware Corporation Law or cognizable under general equitable principles." 351 A.2d at 576. The plaintiffs appeal.

We find it necessary to discuss only the first contention made by plaintiff.

II

Relying on *Allied Chemical & Dye Corporation v. Steel & Tube Co.*, Del.Ch., 120 A. 486 (1923), and *Epstein v. Celotex Corporation*, Del.Ch., 238 A.2d 843 (1968), the Chancellor determined that Vickers, as the majority shareholder of TransOcean, owed a fiduciary duty to plaintiff which required "complete candor" in disclosing fully "all of the facts and circumstances surrounding the" tender offer. 351 A.2d at 573. We agree with that statement of the law. Compare *Singer v. The Magnavox Company, et al.*, Del.Supr., 380 A.2d 969 (1977); *Lank v. Steiner*, Del.Supr., 224 A.2d 242, 244 (1966), applying the "special circumstance rule" to a director possessed of special knowledge withheld from a stockholder with whom he is negotiating for purchase of his stock; and *Iroquois Industries, Inc. v. Lewis*, Del.Supr., 318 A.2d 134 (1974). We disagree, however, with the Trial Court's application of such law to the undisputed facts of this case.

1. For a more complete statement of facts, see the Chancellor's opinion reported at 351 A.2d 570, 571–73 (1976).

■ In our view, the tender offer failed to disclose fully two critical facts: (1) that a "highly qualified" petroleum engineer [351 A.2d at 574], who was a member of TransOcean's management, had calculated the net asset value to be worth significantly more than the minimum amount disclosed in the offer; and (2) that Vickers' management had authorized open market purchases of TransOcean's stock during the period immediately preceding the $12 per share tender offer for bids up to $15 per share.

### A.

We turn first to the net asset value disclosures. The Tender Offer Circular contained the following statement concerning TransOcean's net asset value:

"Management of the Company [Trans-Ocean] has informed the Offeror [Vickers] that, based on a calculation of discounted present value of the Company's reserves and values attributable by the Company's management to the Company's undeveloped acreage and other assets, management of the Company estimates that at this date the Company's net asset value adjusted for such factors is *not less than* $200,000,000 (approximately $16.00 per share) and could be substantially greater. While the foregoing evaluation is based on the current judgment of the management of the Company, it should be recognized that because of the highly uncertain conditions affecting oil and gas values and because of the many assumptions it was necessary for the management of the Company to make in its evaluation, the evaluation is necessarily arbitrary and there can be no assurance that the values ultimately realized from such assets will be consistent with the estimate of the management of the Company. See 'Reserves', 'Valuation of Assets' and 'Earnings'." (Original emphasis.)

Later in the Circular, in the section entitled "Valuation of Assets," similar language was repeated:

"The Company's [i. e., TransOcean's] management estimates that as of this date the aggregate net discounted value of the Company's proved developed, proved undeveloped, probable and possible reserves, its undeveloped acreage and its other assets is *not less than* $200,000,-000 (approximately $16.00 per share) and could be substantially greater. In making its evaluation of assets, management made many assumptions, including, among other things, various assumptions relating to production costs, increasing oil and gas price levels, taxes, depletion allowances, government regulations and controls, intangible drilling costs and investment tax credits, and utilized an appropriate discount factor. While management believes that such assumptions are reasonable in light of current circumstances, there is no assurance that these assumptions will prove correct." (Original emphasis.)

However, at the time of the offer, defendants were in possession of another estimate, prepared by Forrest Harrell, a petroleum engineer and a vice-president of TransOcean, fixing the net asset value at $250.8 million, which computes to approximately $20 per share, and from which one could conclude that the value could be as high as $300 million. Both of these estimates were, of course, substantially higher than the minimum amount stated in the tender offer.

The Trial Court closely examined the Harrell report and concluded that nondisclosure thereof was not fatal; the Court reasoned that the " 'not less than $200,000,-000 . . .' phrase used in the offering circular qualified by the phrase . . . 'and could be substantially greater . . .' furnished the TransOcean stockholders with adequate facts on which to make an educated choice, . . . ." 351 A.2d at 575.

■ This approach to the controversy was, in our view, mistaken in two respects: First, to reach such a conclusion it was necessary for the Court to weigh the merits of the Harrell report and, in the context of this case, that was error. The Court's function was not to go through Harrell's estimates of oil reserves and recoveries, for

example, and make its own judgment about whether these should be "substantially discounted," nor should it have substituted its judgment for Harrell's about the rate which the Federal Power Commission would approve for a sale of natural gas. The stockholders and not the Court should have been permitted to make such qualitative judgments.

The Court's duty was to examine what information defendants had and to measure it against what they gave to the minority stockholders, in a context in which "complete candor" is required. In other words, the limited function of the Court was to determine whether defendants had disclosed all information in their possession germane to the transaction in issue. And by "germane" we mean, for present purposes, information such as a reasonable shareholder would consider important in deciding whether to sell or retain stock. Compare *TSC Industries Inc. v. Northway Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). The objective, of course, is to prevent insiders from using special knowledge which they may have to their own advantage and to the detriment of the stockholders. Compare *Speed v. Transamerica Corporation,* D.Del., 99 F.Supp. 808, 829 (1951); *Talbot v. James,* 259 S.C. 73, 190 S.E.2d 759, 764 (1972); 3 Loss, *Securities Regulation* 1433–1434.

■ Defendants concede that they owed plaintiff a fiduciary duty of complete frankness but assert that they discharged that duty by accurately disclosing that TransOcean's net asset value was "not less than $200,000,000 . . . and could be substantially greater." Technically speaking, the language may be accurate; but that kind of generality is hardly a substitute for hard facts when the law requires complete candor. And when, as here, management was in possession of two estimates from responsible sources—one using a "floor" approach defining value in terms of

its lowest worth, and the other a more "optimistic" or ceiling approach defining value in terms of its highest worth—it is our opinion that complete candor required disclosure of both estimates. If management believed that one estimate was more accurate or realistic than another, it was free to endorse that estimate and to explain the reason for doing so; but full disclosure, in our view, was a prerequisite.

■ A second reason why we think that the Court of Chancery was mistaken in applying the law was that it incorrectly substituted a "disclosure of adequate facts" standard (351 A.2d at 575) for the correct standard, which requires disclosure of *all* germane facts. Completeness, not adequacy, is both the norm and the mandate under present circumstances.

Given Harrell's undisputed qualification and his status in management, we conclude that failure to disclose the substance of his report was a violation of the fiduciary duty owed by defendants to plaintiff. Without question, Harrell's estimate, which contained information pertaining to the net value of TransOcean's assets and the per share value of its stock, was germane to the tender offer in that it included the type of information which a reasonable shareholder would consider important in deciding whether to sell or retain stock. Compare *TSC Industries Inc. v. Northway Inc.,* supra.

We conclude, therefore, that it was a breach of the fiduciary duty of candor for defendants to fail to disclose the Harrell estimate to those persons to whom they owed the duty and whose stock Vickers was attempting to acquire.

### B.

The same rationale applies to defendants' failure to disclose that, prior to the tender offer of $12, Vickers had authorized open market purchases of TransOcean's shares at a price of $15 per share.[2] The Trial Court

---

2. In the section of the Tender Offer Circular entitled "Interests in Securities of the Company," the following was disclosed concerning Vickers' public acquisition of TransOcean's stock in the months prior to the tender offer:

"Offeror is presently the beneficial owner of 6,785,285 shares of Stock, constituting approximately 53.5% of the Company's outstanding shares. On June 27, 1974 Esmark announced that its Board of Directors had

discounted that allegation, reasoning that "the record is clear that the $15 limit set for such purchases of TransOcean stock was just that, namely a ceiling on board authorization of such purchases so that new resolutions would not have to be sought from time to time if required to meet the market price of TransOcean," 351 A.2d at 575. The inference is that the authorization price was nothing more than a procedural convenience and not an accurate reflection of Vickers' opinion as to the true value of TransOcean's shares. Accordingly, the Court ruled that nondisclosure thereof was not fatal.

But, again, the Court incorrectly weighed the quality of the information before it ruled on the claim of nondisclosure. Whether the authorization price accurately stated Vickers' opinion as to true value of TransOcean's shares, or whether it was a tool of convenience established to facilitate the acquisition of TransOcean's shares in a fluctuating market, is not relevant in a context involving the fiduciary obligation of full disclosure. What is important is the fact that the authorization price was germane to the terms of the tender offer, and as such it should have been disclosed to the minority shareholders.

### C.

The Court emphasizes that we do not hold that the Harrell estimate was a more accurate estimate of TransOcean's net asset value, nor do we determine that $15 per share was a more reasonable price for the TransOcean stock. We hold only that the minority shareholders had the right to this information and to make their respective judgments about its significance before they were asked to sell their shares to Vickers.

In view of our decision on these disclosure issues, it is unnecessary to consider in the appeal other contentions of the parties, including the defense of "good faith reliance" made by certain individual defendants.

Reversed and remanded for proceedings consistent herewith.

### ON MOTIONS FOR REARGUMENT

After the opinion was docketed all defendants moved for reargument on several different grounds and, at the Court's direction, plaintiff filed an answer to each of the two separately stated motions. Cf. *Ingersoll v. Rollins Broadcasting of Delaware, Inc.*, Del.Supr., 269 A.2d 217 (1970).

The individual defendants, particularly Stormy F. Smith, William A. Alexander and Edward J. Hudson, have argued that they are exonerated from any personal liability because of "good faith reliance" upon the advice of counsel, because of the business judgment rule, and for other reasons. A ruling on these contentions was not made by the Court of Chancery because its decision on the disclosure issue made such a determination unnecessary. In short, the Trial Court did not reach the personal liability issues, nor do we.

We have held that failure to disclose the substance of the Harrell report and the Vickers' authorization of open market purchases at $15 per share was, in each instance, a violation of the fiduciary duty owed to the minority stockholders. It appears that the individual defendants may have differing responsibilities for these omissions as well as other defenses which have been alleged. We make no judgment or comment about the ultimate liability of any individual defendant nor of any defense alleged, except to direct that on remand the Trial Court consider such matters and make whatever findings and state whatever conclusions it deems appropriate as part of its final judgment.

The motions for reargument are denied.

approved a program for the Offeror to acquire up to 1,500,000 shares of Stock of the Company. Pursuant to that program the Of-

feror acquired 245,000 shares of Stock in open market transactions at an average price of $11.49 per share . . . ."