Kevin D. **FLYNN,** John H. **Jacobs,** and John J. **DeLuca,** on behalf of themselves and all others similarly situated

v.

**BASS BROTHERS ENTERPRISES, INC.,** National Alfalfa Dehydrating and Milling Company, Anne H. Bass, Anne T. Bass, Edward P. Bass, Nancy Lee Bass, Perry R. Bass, Robert M. Bass, Sid R. Bass, W. Fred Massey, Charles R. Peterson and Richard E. Rainwater.

Civ. A. No. 76–1948.

United States District Court,
E. D. Pennsylvania.

Sept. 8, 1978.

---

Donald L. Weinberg, Philadelphia, Pa., for plaintiffs.

Oliver C. Biddle, Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

Plaintiffs in this securities class action contend that a tender offer and a subsequent merger, both effected by defendant Bass Brothers Enterprises, Inc., violated federal securities law and Delaware corporation law. In particular, plaintiffs urge that these activities violated sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e) (1976), Rule 10b–5, 17 C.F.R. § 240.10b–5 (1977), and Delaware common law. Jurisdiction is conferred by 15 U.S.C. § 78aa (1976) and by the doctrine of pendent jurisdiction. Plaintiffs seek partial summary judgment in their favor, and defendant Bass Brothers, although it has filed no formal motion, argues in its briefs that it is entitled to summary judgment in its favor. *See generally* 6 Moore's Federal Practice ¶ 56.12 at 56–331 to 56–334 (2d ed. 1948) (cross-motion for summary judgment is not a prerequisite to the entry of judgment in favor of the non-moving party). For the reasons hereafter stated, I conclude that neither plaintiffs nor defendant are entitled to summary judgment at this time.

The essential facts here are undisputed. Defendant Bass Brothers Enterprises, Inc. (hereinafter Bass Brothers) is a closely-held Texas corporation with its principal offices in Fort Worth, Texas. Complaint ¶ 6(a). In March of 1976, at the time of the disputed tender offer, "the principal business of Bass Brothers was oil exploration and the production of hydrocarbons through a wholly-owned subsidiary." Bass Affidavit ¶ 2, App. (Document No. 53) 202a. Bass Brothers was also involved, either directly or through subsidiaries, in "radio and television stations operation, ranching and cattle-raising interests, and other businesses." Complaint ¶ 6(a). The eight individual defendants who remain in the case are all directors of Bass Brothers. Defendant National Alfalfa Dehydrating and Milling Company (hereinafter National Alfalfa), the target of Bass Brothers' tender offer, is a Delaware corporation with its principal offices in Kansas City, Missouri. *Id.* ¶ 7. By early 1975, nearly half of National Alfalfa's income was derived from the processing and sale of alfalfa for animal feed; most of the balance was derived from National Alfalfa's farming and farm supply operations. App. (Document No. 53) 12a–13a.

Prochemco, Inc. (hereinafter Prochemco) is a Texas corporation with its executive offices in Amarillo, Texas. Spangler Affidavit ¶ 2, App. (Document No. 53) 199a. By early 1974, Prochemco "was engaged almost exclusively in cattle feeding and ranching." *Id.* In mid-1974, Prochemco's president, desirous of purchasing a large block of National Alfalfa stock, approached Bass Brothers as a possible source of financing for such a purchase. Although Bass Brothers declined to finance such a purchase by Prochemco, it did "indicate to ProChemco that it *might* be interested if it could proceed as the principal in the transaction." Bass Affidavit ¶ 4, App. (Document No. 53) 203a (emphasis in original). In December of 1975, Prochemco informed Bass Brothers that it had failed to obtain financing from any source, and that the large block of National Alfalfa stock was still available. *Id.* ¶ 6. On December 29, 1975, Bass Broth-

ers entered into an option agreement with Charles R. Peterson, a former officer of National Alfalfa and the holder of some 52% of the outstanding National Alfalfa common stock. *Id.* ¶ 7. On January 7, 1976, Bass Brothers exercised its option and purchased approximately 1.3 million shares of National Alfalfa from Peterson, for a total price of $8.44 million, or approximately $6.47 per share. App. (Document No. 53) 108a, 119a. Bass Brothers thus became the majority shareholder in National Alfalfa.

To place the events that followed in their proper perspective, it will be helpful to backtrack for a moment. I have already noted that Prochemco itself initially sought to acquire the Peterson stock, and that it approached Bass Brothers as a possible source of financing for such a purchase. In presenting its case to Bass Brothers, Prochemco relied in part upon two documents that are of overriding importance in the present litigation. The first document, dated October of 1974, spanned some two hundred pages. App. (Document No. 54). It described Prochemco's proposed acquisition of the Peterson stock, and it contained various public reports and documents that pertained to either Prochemco or National Alfalfa. Interwoven with these materials were analyses, prepared by Prochemco, of National Alfalfa's history, operations, and assets. Of particular importance here is a three-tiered valuation of National Alfalfa's assets, also prepared by Prochemco. This chart reflected overall values *per share of National Alfalfa* as follows:

$6.40 could be realized through "liquidation under stress conditions"

$12.04 could be realized through "liquidation in an orderly fashion over a reasonable period of time"

$16.40 represented National Alfalfa's value "as [an] ongoing venture"

In addition, Prochemco subsequently presented Bass Brothers with a second report on the proposed acquisition. This report, dated September of 1975, was similar in format to the first one, although somewhat more abbreviated. It, too, contained a chart reflecting Prochemco's valuation of National Alfalfa's assets, but this chart was not in the three-tiered format used previously. Rather, this chart gave only two figures: "Value per Peterson" and "Value per Prochemco." As presented in the chart, the former value was $17.28 per share, and the latter was $7.60 per share. Two explanatory footnotes revealed the source of part, but not all, of the discrepancy in the two valuations; Peterson and Prochemco used sharply disparate prices in determining the value of National Alfalfa's land holdings, which accounted for more than half the total value of all National Alfalfa assets.

Significantly, Bass Brothers does not dispute that it received both reports from Prochemco prior to the time of the disputed tender offer. Bass Affidavit ¶ 3, App. (Document No. 53) 203a.

Shortly after it purchased the Peterson stock, Bass Brothers purchased an additional 226,673 shares, or 9.1% of the then-outstanding shares of National Alfalfa, for approximately $1.46 million, or $6.45 per share. App. (Document No. 53) 7a. Thus, on February 10, 1976, Bass Brothers owned a total of 61.2% of the outstanding shares.

On March 2, 1976, Bass Brothers released its tender offer for "any and all" outstanding shares of National Alfalfa at $6.45 per share. App. (Document No. 53) 1a–10a. The appendices to this tender offer contained certain financial data regarding National Alfalfa from which a shareholder could have concluded that National Alfalfa stock was worth less than $6.45 per share. *See, e. g.,* Schedule of Capitalization and Stockholders' Equity, App. (Document No. 53) 64a–69a. The tender offer made no reference at all to the Prochemco valuations, which reflected values per share exceeding $6.45. However, the tender offer did include certain related information that warrants some discussion here.

Specifically, the tender offer referred repeatedly to a February 27, 1976 letter from the president of National Alfalfa, which was attached as Appendix E to the tender offer. This letter, which was originally sent to Bass Brothers, related certain infor-

mation pertaining to National Alfalfa's land holdings, in order that Bass Brothers might incorporate that information into its tender offer. Essentially, the letter stated that National Alfalfa's land had appreciated significantly, and that, as a result, "stockholders could receive, upon a liquidation of the Company, an amount per Share significantly higher than the current book value . . . and possibly higher than the . . . $6.45 per Share offered by [Bass Brothers]." App. (Document No. 53) 91a. The tender offer itself described this letter as follows:

"Appendix E contains important information with respect to [National Alfalfa's] belief that the aggregate current fair market value of its agricultural land may be substantially higher than its original cost as reflected on the books of [National Alfalfa]. Such information was provided by [National Alfalfa] (pursuant to authorization by its Board of Directors) specifically for inclusion herein pursuant to [Bass Brothers'] request for additional information to be included in this Offer. [Bass Brothers] has made no independent appraisal of the value of [National Alfalfa's] land and makes no representation with respect thereto." App. (Document No. 53) 6a.

On March 11, 1976, the chairman of the board of National Alfalfa wrote to all National Alfalfa shareholders, stating his view that Bass Brothers' inclusion of the letter in its tender offer was entirely unauthorized. App. (Document No. 53) 95a–97a. Although this letter repeated the underlying facts set out in the original letter (Appendix E), it expressly disavowed any and all conclusions drawn by Bass Brothers from those facts. Finally, it expressed the opinion of the board of directors that the tender offer mistakenly implied that the board approved the terms of the offer, "when the Board has neither approved nor disapproved the adequacy of $6.45 per share." *Id.* 97a.

In response to this second letter, Bass Brothers, on March 15, 1976, issued a "First Supplement" to the tender offer. This supplement advised shareholders to "disre-

gard" Appendix E to the tender offer in determining whether or not to sell their shares. It also reiterated the basic facts indicating that National Alfalfa's land holdings had appreciated in value, as those facts were stated in the March 11 letter from the chairman of the board of National Alfalfa. Finally, it restated the conclusion contained in the original letter (Appendix B) from National Alfalfa's president: "[S]tockholders could receive, upon liquidation of the Company, an amount per Share significantly higher than the current book value and possibly higher than the price of $6.45 per Share offered by [Bass Brothers] in the Offer." App. (Document No. 53) 98a. This time, however, the conclusion was presented as a conclusion drawn by Bass Brothers itself, rather than as a conclusion drawn by National Alfalfa and simply reported by Bass Brothers.

This supplement also extended the duration of the offer by one week, "to afford stockholders an opportunity to evaluate" both the second letter and the clarification contained in the supplement. While the offer was still in effect, the three named plaintiffs tendered their shares of National Alfalfa to Bass Brothers for $6.45 per share. At the expiration of the extended offer, Bass Brothers owned more than 92% of the outstanding shares of National Alfalfa.

Shortly after the expiration of the tender offer, Bass Brothers formed Bass Brothers Farming Company (hereinafter "Bass Farming"), a wholly-owned subsidiary, and incorporated it under Delaware law. Bass Brothers then transferred to Bass Farming more than 90% of the outstanding common stock of National Alfalfa, and effected a "short-form" merger between the two corporations, with National Alfalfa as the surviving entity. National Alfalfa thus became a wholly-owned subsidiary of Bass Brothers.

Based on the facts as recounted here, plaintiffs seek partial summary judgment against Bass Brothers on the issue of liability. Although plaintiffs have pleaded legal claims under both section 10(b) of the Secu-

rities Exchange Act, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5, 17 C.F.R. 240.10b–5 (1977), they advance neither of these theories as a basis for partial summary judgment at this time. Rather, plaintiffs rely on section 14(e) of the Securities Exchange Act, 15 U.S.C. § 78n(e) (1976), and on two state law claims, in support of their motion. Defendant Bass Brothers, for its part, seeks summary judgment in its favor on each of these three legal theories. I shall consider each of the theories separately.

## SECTION 14(e)

■ In pertinent part, section 14(e) of the Securities Exchange Act provides:

"It shall be unlawful for any person to make any untrue statement of a material fact *or* omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading *or* to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e) (1976) (emphasis supplied).

It is now established beyond question that this provision gives rise to an implied private right of action. *See, e. g., Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 55 & n. 4, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (Stevens, J., dissenting); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 596 n. 20 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 2371 (1974) (Wisdom, J.) (collecting cases).

Plaintiffs contend that Bass Brothers, by omitting from its tender offer any mention of the Prochemco valuations of National Alfalfa's assets, violated section 14(e), and that this is "a classic and simple case for liability." Bass Brothers raises several contentions by way of opposition, among them the suggestion that a genuine factual issue exists as to the materiality of the Prochemco valuations. I believe that the issue of materiality here must be resolved by the

trier of fact and that plaintiffs' motion must be denied on that ground alone.

Materiality is, of course, a critical element of liability under section 14(e). *See Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 362 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). "In deciding the materiality of the misstatement [or omission], the focus is on the effect of the misstatement or omission on a reasonable investor's decision" whether to tender his shares. *A & K R. R. Materials, Inc. v. Green Bay & W. R. R.,* 437 F.Supp. 636, 642 (E.D.Wis.1977).

Beyond these general principles, however, a measure of uncertainty surrounds the materiality standard under section 14(e). In one of the earliest appellate decisions involving section 14(e), Judge Friendly, writing for himself and another member of the panel, stated that the test was "whether 'any of the stockholders who tendered their shares would probably not have tendered their shares' if the alleged violations had not occurred." *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969) (quoting *Symington Wayne Corp. v. Dresser Indus.,* 383 F.2d 840, 843 (2d Cir. 1967) (materiality under Rule 10b–5)). On the other hand, more recent developments under section 14(a) and Rule 14a–9, which prohibit misleading statements or omissions in connection with proxy solicitations, suggest that a broader standard of materiality may be appropriate under section 14(e).

Thus, in *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court had this to say:

"The general standard of materiality that we think best comports with the policies of Rule 14a–9 is as follows: An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . [This standard] does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.

What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

The Third Circuit, moreover, adopted a virtually identical standard for section 14(a) actions in *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 770–71 (3d Cir. 1976).

■ In view of the fundamental similarities between tender offers, which are governed by section 14(e), and proxy contests, which are governed by section 14(a) and the SEC rules promulgated thereunder, *see Electronic Specialty Co. v. International Controls Corp., supra*, 409 F.2d at 948, I conclude that the complained-of omissions from Bass Brothers' tender offer should be measured in light of the materiality standard set out in *TSC Indus., Inc. v. Northway, Inc., supra*.

Plaintiffs argue that the omitted valuations were material as a matter of law, inasmuch as a shareholder's decision whether or not to tender his shares inevitably turns in large measure on whether he believes the offeror's price to be adequate. I believe that this argument greatly oversimplifies the issue. The following excerpt from the affidavit of Bass Brothers' president helps to put the Prochemco valuations in better perspective:

"Bass Brothers *at no time* gave the estimates contained in these reports any credence. Bass Brothers did not consider ProChemco to have any expertise with respect to the estimates; ProChemco never held itself out as having any expertise; and Bass Brothers felt that many of the assumptions giving rise to the estimates were highly speculative and wrong. In view of this and the fact that Bass Brothers never relied on or utilized the estimates, it never occurred to Bass Brothers that anyone would even claim such esti-

mates should have been included in [the tender offer]. This is especially true because these estimates, unlike the information provided to Bass Brothers by National Alfalfa, were prepared by a third party unrelated to either Bass Brothers or National Alfalfa. Moreover, Bass Brothers viewed these estimates as biased in the sense that they were made by a third party seeking to secure financing based thereon." Bass Affidavit ¶ 5, App. (Document No. 53) 204a (emphasis in original).

In light of Bass Brothers' perception of the Prochemco valuations, it appears that Bass Brothers, had it included those valuations in its tender offer, would at the very least have included a statement explaining the source of those valuations. Perhaps Bass Brothers would also have included a statement, similar to the one just quoted, disavowing the valuations as based on "highly speculative and wrong" assumptions. Or, finally, perhaps Bass Brothers would have undertaken its own valuation of National Alfalfa's assets, and included this "alternative" valuation in its tender offer. Plaintiffs, for their part, seem to contend that some effort in this direction would have been *required* under section 14(e) in order to assure that the tender offer as a whole was not misleading: "Where an important matter is open to a difference of opinion, full disclosure of all available facts, including management's assessment of the weight it believes should be given to any factor and why, is the lawful and proper way to proceed." Plaintiffs' Reply Memorandum (Document No. 57) at 11 (citations omitted).

In short, this is not a typical nondisclosure case. Rather than simply weighing the impact of a single omitted fact on the "total mix" of information made available to the investor, the trier of fact in this case will first have to determine what form the hypothetical "complete" tender offer would have taken. The factual issue is simply this: If Bass Brothers had included the Prochemco valuations in its tender offer, what additional, related information would it also have included? Once that issue is

resolved, it will remain to consider the impact of that *additional information*, including the valuations, on the "total mix" of information actually disclosed to National Alfalfa shareholders.

■ At this stage of the case, however, Bass Brothers has offered no evidence as to what its hypothetical "complete" tender offer would have contained. Under the circumstances, then, and for the limited purpose of this summary judgment motion, the materiality issue in this case may be tentatively formulated as follows: Is there a substantial likelihood that disclosure of the Prochemco valuations, accompanied by Bass Brothers' disavowal of those valuations as unfounded, would have been viewed by the reasonable investor as having significantly altered the "total mix" of information available to him?

In determining whether this question may properly be resolved as a matter of law on the present motion, I am mindful of the Supreme Court's remarks in *TSC Indus., Inc. v. Northway, Inc., supra* :

> "The issue of materiality may be characterized as a mixed question of fact and law, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law.' " 426 U.S. at 450, 96 S.Ct. at 2132 (citations and footnotes omitted).

*Accord, Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 771 (3d Cir. 1976).

Without belaboring the point, I believe that the trier of fact alone can properly resolve the materiality issue in this case. On the present record, I cannot say that the facts lead ineluctably to an ultimate finding of materiality. A jury might reasonably conclude that the omitted Prochemco valuations, when read against the backdrop of Bass Brothers' disavowal, would have assumed little or no significance in the eyes of a reasonable investor, so that Bass Brothers actually omitted no material fact. Of course, the evidence adduced at trial might also lead a jury to draw the opposite conclusion. Be that as it may, I cannot say at this time that the omitted valuations were material as a matter of law. Accordingly, I will deny plaintiffs' motion for partial summary judgment on the issue of liability under section 14(e).

Bass Brothers, however, contends that the materiality issue need not be reached in this case because, as a matter of law, it was under no obligation to disclose the Prochemco valuations in its tender offer. This argument begins with the premise that "the disclosure requirements of the anti-fraud provisions of the 1934 Act apply only to 'inside' information." Defendant's Supplemental Memorandum of Law (Document No. 60) at 3. Because the Prochemco valuations were not "inside" information, Bass Brothers reasons, no duty of disclosure arose with respect to them, and so no basis exists for imposing liability under section 14(e).

■ In support of its position, Bass Brothers relies solely on cases construing Rule 10b–5, 17 C.F.R. 240.10b–5 (1977), which have unquestionably approached the duty to disclose by inquiring whether the defendant was an "insider." *See generally* R. Jennings & H. Marsh, Securities Regulation—Cases and Materials 946–53 (1977). My own research indicates that, in the section 14(e) context as well, a corporate "insider" will be held to a higher duty of disclosure than will an "outsider." *See, e. g., Blanchette v. Providence & Worcester Co.,* 428 F.Supp. 347, 356 (D.Del.1977); *Broder v. Dane,* 384 F.Supp. 1312, 1318–19 (S.D.

N.Y.1974). Thus, an offeror's "outsider" status is one factor to be considered in determining whether a particular omission ran afoul of section 14(e).

It is important to bear in mind, however, that, at the time of its tender offer, Bass Brothers *was* an "insider," for it was by then the majority shareholder in National Alfalfa.[1] Bass Brothers' position here is not that "outsiders" have no duty of disclosure under section 14(e), but that neither "insiders" nor "outsiders" have any duty of disclosure except with respect to "inside" information.

Assuming *arguendo* that the disclosure aspect of section 14(e) *is* addressed primarily to "inside" information, it nevertheless is not clear that Bass Brothers could not be found liable on the facts of this case. *See also* Note, *Defensive Tactics Employed by Incumbent Managements in Contesting Tender Offers*, 21 Stan.L.Rev. 1104, 1121–22 (1969) ("there is probably little to be gained from a wholesale incorporation of rule 10b–5 into section 14e"). Bass Brothers was, as I have already noted, an "insider" at the time of its tender offer, and the information omitted from that tender offer, even if not typical "inside" information, was at least non-public information.[2] True, Bass Brothers acquired that information long before it acquired the majority stock interest in National Alfalfa, and thus long before it became an "insider." Nevertheless, I am not persuaded at this point that the obligation of disclosure under section 14(e) is rigidly confined to "inside" information acquired *by reason of* the offeror's "insider" status. *See, e. g.,* ALI Fed.Sec. Code § 1603(c) (Proposed Off. Draft 1978) (creating a limited class of "secondary insid-

ers" whose duty to disclose when trading arises only with respect to information acquired "by virtue of" a special relationship to the issuer; controlling shareholders *not* considered "secondary insiders"). Accordingly, I will not enter summary judgment in favor of Bass Brothers at the present time. Bass Brothers, of course, is free to renew its contention at some future time.

Bass Brothers also argues here that the rule of *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), as applied in *Alaska Interstate Co. v. McMillian,* 402 F.Supp. 532 (D.Del.1975), establishes as a matter of law that the Prochemco valuations should not have been disclosed in its tender offer. In *Kohn,* the Third Circuit adopted the general rule that "presentations of future earnings, appraised asset valuations and other hypothetical data in proxy materials" were to be discouraged. 458 F.2d at 265. In *Alaska Interstate Co.,* Judge Stapleton applied the *Kohn* rule in the context of a contested tender offer. The target company there supplied the offeror with a rough working schedule showing a range of liquidation values for its assets under various conditions. Defendant, in its tender offer, disclosed (1) its receipt of this "inside" information, and (2) the several values contained in the schedule, but it went on to state that both it and the target company viewed the information as unreliable. Plaintiff, an unsuccessful competing offeror, argued that defendant should also have disclosed that it viewed the higher liquidation values contained in the schedule as more accurate than the lower liquidation values. Judge Stapleton, after noting that this was a close question, rejected plaintiff's argument, and stated: "I con-

---

1. The majority shareholder in the target company is generally viewed as an "insider." *See, e. g., Speed v. Transamerica Corp.,* 99 F.Supp. 808, 828–29 (D.Del.1951), *aff'd,* 235 F.2d 369 (3d Cir. 1956); R. Jennings & H. Marsh, Securities Regulation—Cases and Materials 947 & n. 12 (1977). *Accord,* ALI Fed.Sec.Code § 1603(b)(2) (Proposed Off. Draft 1978).

2. "Information is non-public when it has not been disseminated in a manner making it reasonably available to investors generally." *In re*

*Investors Mgmt. Co.,* 44 S.E.C. 633, 643 (1971). It is undisputed here that the Prochemco valuations were made available by Prochemco to prospective lenders, including several banks and investment bankers, but the reports containing those valuations were prepared as internal analyses for the Prochemco board of directors. Spangler Affidavit ¶ 6, App. (Document No. 53) 199a. There has been no suggestion here that the valuations were generally available to National Alfalfa shareholders.

clude that the approach of 'we received these figures from [the target company] but neither of us think they should be relied upon,' was the best that could reasonably be expected under the circumstances." 402 F.Supp. at 573.

I fail to see how *Alaska Interstate Co.* aids Bass Brothers here, for the form of disclosure that Judge Stapleton approved there is precisely the form that plaintiffs urge should have been employed here by Bass Brothers. Plaintiffs contend that Bass Brothers should have disclosed the Prochemco valuations in its tender offer and set forth its view that those valuations were unreliable. That approach, whether or not it is obligatory, certainly is sufficient to discharge the offeror's duty of disclosure under these circumstances, and that is precisely what Judge Stapleton held in *Alaska Interstate Co.* In short, I cannot grant summary judgment in favor of Bass Brothers on the authority of that decision.

## FIDUCIARY DUTY UNDER DELAWARE LAW

Plaintiffs also contend that Delaware law imposes a fiduciary duty requiring "full disclosure of valuations of the stock tendered for where the offering party is already the majority shareholder." Plaintiffs' Memorandum of Law (Document No. 49) at 10. In support of their motion for partial summary judgment on this state law theory of liability, plaintiffs rely solely on *Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del. 1977), which they contend is "directly controlling." Plaintiffs' Memorandum of Law (Document No. 57) at 5. I conclude that a factual issue pertinent to this claim exists and must be left to the trier of fact, and I will therefore deny plaintiffs' motion.

■ Without belaboring the point, the fiduciary duty of disclosure imposed on a majority shareholder under Delaware law is limited to *material* information. *See, e. g., Lynch v. Vickers Energy Corp., supra*, 383 A.2d at 281 (requiring disclosure of all "germane" information, which the court defined as all "information such as a reasonable shareholder would consider important in de-

ciding whether to sell or retain stock"). The test of materiality here is no different from the test I discussed earlier in connection with plaintiffs' section 14(e) claim. *Cf. id.* (citing *TSC Industries, Inc. v. Northway, Inc., supra* ). Thus, inasmuch as I have already ruled that the trier of fact must determine whether the Prochemco valuations were material information under section 14(e), it follows that the trier of fact must determine whether those valuations were material under the law of Delaware. I cannot grant plaintiffs' motion for summary judgment on the issue of liability so long as the question of materiality remains in dispute.

Bass Brothers, on the other hand, urges that I grant summary judgment in its favor on the ground that the *Lynch* case involved "inside" information, whereas the present case assertedly does not. *Lynch*, however, did not hold that a majority shareholder's duty of disclosure is limited to inside information; indeed, the court expressly stated that defendants there were required to disclose "*all* [material] information in their possession." 383 A.2d at 281 (emphasis supplied). The *Lynch* court did find that the information omitted from defendants' tender offer was material *as a matter of law*, in part because it was "inside" information, but it certainly did not limit the duty of disclosure to "inside" information. Accordingly, I cannot grant summary judgment in favor of Bass Brothers simply because *Lynch* is factually distinguishable from the instant case.

At the close of oral argument, counsel for Bass Brothers advanced an argument that had not appeared in any of the numerous written submissions. Bass Brothers argued that Delaware law, to the extent it requires greater disclosure by a tender offeror than the Williams Act itself requires, is preempted and hence violative of the supremacy clause. Although counsel for Bass Brothers offered no authority in support of this position, Judge Wisdom's recent opinion in *Great Western United Corp. v. Kidwell*, 577 F.2d 1256 (5th Cir. 1978), sets out the general principles to be applied in determining

the validity of state tender-offer regulation. *See generally* Langevoort, *State Tender-Offer Legislation: Interests, Effects, and Political Competency,* 62 Cornell L.Q. 213, 246–54 (1977). Any discussion of the merits of this argument would be premature, for it is not clear at this point that Delaware law actually requires greater disclosure in the present factual context than does the Williams Act. Nor is it clear that any such discrepancy runs counter to the policies underlying federal regulation of tender offers. Accordingly, I need not address Bass Brothers' contention at the present time.

### PROHIBITED PURPOSE UNDER DELAWARE LAW

Plaintiffs also contend that Bass Brothers violated the fiduciary duty imposed upon majority stockholders by Delaware law when it merged National Alfalfa with Bass Brothers Farming Company, allegedly for the sole purpose of "forcing out" all public ownership of National Alfalfa. Plaintiffs emphasize that this short-form cash merger was effected for no valid corporate or business purpose, and that it was therefore improper under Delaware law. On this basis, plaintiffs again seek partial summary judgment.

Bass Brothers, for its part, apparently concedes that a short-form merger effected solely to "squeeze out" minority shareholders amounts to a violation of the majority shareholder's fiduciary duty. *Compare Singer v. Magnavox Co.,* 380 A.2d 969 (Del. 1977) *with Najjar v. Roland Int'l Corp.,* 387 A.2d 709 (Del.Ch.1978) (*Singer* rationale extended to cover short-form mergers). It contends, however, that the disputed merger was effected for entirely valid business purposes, most notably the infusion of new

capital into National Alfalfa. Bass Affidavit ¶¶ 8, 9, App. (Document No. 53) 202a; Defendant's Memorandum of Law (Document No. 52) at 17–19.

Plaintiffs do not dispute that the infusion of new capital into the corporation is a valid business purpose under Delaware law. Rather, plaintiffs argue here that Bass Brothers is no longer free to state its true purpose in merging National Alfalfa into a Bass Brothers subsidiary. Rather, plaintiffs contend, Bass Brothers is estopped from so doing by the statement of purpose it included in the tender offer for all outstanding shares of National Alfalfa. That statement of purpose, somewhat condensed, reads as follows:

> "Offeror's purpose in making this offer is to acquire all remaining Shares of [National Alfalfa] which it does not presently own. . . .
>
> Offeror also intends to consider the formulation of a plan of merger pursuant to which [National Alfalfa] will be merged into Offeror or a wholly-owned subsidiary of Offeror and each stockholder of [National Alfalfa] . . . would receive $6.45 per Share in exchange for his Shares." Tender Offer p. 8, App. (Document No. 53) 8a.

Plaintiffs assert, somewhat overenthusiastically, that this "is a classic case for estoppel as a matter of law." [3] Plaintiffs' Memorandum of Law (Document No. 57) at 21. As I view the matter, however, plaintiffs' estoppel argument cannot prevail here.

■ To begin with, the statement of purpose set out in Bass Brothers' tender offer plainly dealt only with the purpose of the *tender offer* itself, and not with the purpose

---

**3.** Interestingly, plaintiffs fail to address the issue of what law governs the matter of estoppel here. They cite three decisions on estoppel, each of which applies the law of a different jurisdiction: *Stevens v. New Orleans & N.E. Ry.,* 341 F.Supp. 497 (E.D.La.1972) (applying Louisiana law); *Holt v. Southern Ry.,* 51 F.R.D. 296 (E.D.Tenn.1969) (applying Tennessee law); *General Contract Purchase Corp. v. Bitomski,* 102 Pa.Super. 266, 156 A. 727 (1931) (applying Pennsylvania law). Yet two other jurisdic-

tions—Delaware and Texas—appear *prima facie* to be more involved with the events at issue here than is Louisiana, Tennessee, or Pennsylvania. *See generally* Restatement (Second) of Conflict of Laws § 6(2) (1971). I need not resolve this conflicts issue, however. Even without examining the peculiar features of estoppel doctrine in each concerned jurisdiction, it is abundantly clear that plaintiffs' argument based on equitable estoppel must be rejected.

of the subsequent *merger*, which at that time was still in the planning stage. Under the circumstances, I see no basis whatever for holding that Bass Brothers is now estopped from asserting its purpose in effectuating the subsequent merger.

■ Moreover, even if the statement of purpose in Bass Brothers' tender offer is interpreted as embracing the merger as well as the tender offer itself, the facts of this case fall far short of justifying the application of equitable estoppel. Plaintiffs have simply failed to show that they relied on Bass Brothers' original statement of purpose, or that they would be unjustly injured if Bass Brothers were now to be permitted to expand upon that initial statement of purpose. Indeed, it is not even clear that the valid business purpose Bass Brothers now seeks to assert, is inconsistent with plaintiffs' understanding of the original statement of purpose, contained in the tender offer. Under the circumstances, I conclude that the doctrine of equitable estoppel cannot properly be invoked on plaintiffs' behalf. *See generally* 3 J. Pomeroy, A Treatise on Equity Jurisprudence § 804 at 189 (5th ed. 1941). Accordingly, I see no basis on which to grant summary judgment in plaintiffs' favor, and their motion will thus be denied.

Bass Brothers, for its part, contends that *it* is entitled to summary judgment on the present record inasmuch as the affidavit of its president, which articulates a valid business purpose for the merger, is uncontroverted. Plaintiffs argue that Bass Brothers is not entitled to judgment at this time, because recent Delaware cases hold that a mere "*allegation* of a sole purpose to squeeze out the minority [shareholders] *requires* a trial on the issue of [the] entire fairness [of the merger]." Plaintiffs' Reply Memorandum (Document No. 57) at 19 (emphasis in original, footnote omitted). *See Najjar v. Roland Int'l Corp.*, 387 A.2d 709 (Del.Ch.1978); *Kemp v. Angel*, 381 A.2d 241 (Del.Ch.1977). I have grave doubts about the soundness of plaintiffs' underlying premise, which is that Delaware law can effectively suspend the operation of federal summary judgment procedures in connection with a pendent claim under Delaware law. The teaching of *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), that state law cannot displace applicable Federal Rules of Civil Procedure in cases heard under the diversity jurisdiction, is surely applicable in the context of state law claims that are heard in federal court under the doctrine of pendent jurisdiction. Thus, the Delaware cases cited by plaintiff are, in and of themselves, no basis for denying Bass Brothers the judgment to which it apparently is entitled.

Nevertheless, out of an abundance of caution, I will refrain from entering judgment in favor of Bass Brothers at this time in order to afford plaintiffs a final opportunity to raise any remaining issues bearing on their claim that the short-form merger was improper under Delaware law. As I view the present record, plaintiffs' theory of liability is simply that a merger effected for the *sole* purpose of forcing out minority shareholders violates Delaware corporation law, and Bass Brothers' affidavit setting out a valid business purpose for the merger necessarily stands as a (seemingly insurmountable) obstacle to plaintiffs' recovery under that theory. Bass Brothers is, of course, free to renew its contention in the event that plaintiffs fail to submit anything further that would justify withholding summary judgment.

## CONCLUSION

For the reasons set out in this opinion, plaintiffs' motion for partial summary judgment will be denied. The summary judgment sought by Bass Brothers will not be entered at this time.